## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EXPORT PACKERS COMPANY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>FRESH GARLIC PRODUCERS ASSOCIATION AND ITS INDIVIDUAL MEMBERS, ET AL.,<br><br>Defendant-Intervenors. | Before: The Honorable Jane A. Restani<br><br>Court No. 24-00061 |

## EXPORT PACKERS COMPANY LIMITED'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Export Packers Company Limited ("Export Packers"), respectfully moves this Court for an order granting judgment on the agency record against Defendant, the United States. Export Packers is entitled to judgment in its favor, as explained in the accompanying memorandum of law.

WHEREFORE, Export Packers respectfully moves this Court to enter an order granting its motion for judgment on the agency record, setting aside as unlawful the final determination of the U.S. Department of Commerce challenged herein, and remanding the final determination for reconsideration in accordance with the Court's decision.

Respectfully submitted,

/s/ Jeffrey S. Neeley
Jeffrey S. Neeley
Robert Stang
Stephen Brophy
Jamie Shookman
HUSCH BLACKWELL, LLP
1801 Pennsylvania Avenue
NW Suite 1000
Washington, DC  20006
(202) 378-2334
jeffrey.neeley@huschblackwell.com

*Counsel for Export Packers Company Limited*

Dated: July 15, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EXPORT PACKERS COMPANY LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Before: The Honorable Jane A. Restani |
| ) | |
| Defendant, ) | Court No. 24-00061 |
| ) | |
| and ) | |
| ) | |
| FRESH GARLIC PRODUCERS ) | |
| ASSOCIATION AND ITS INDIVIDUAL ) | |
| MEMBERS, ET AL., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

### EXPORT PACKERS COMPANY LIMITED'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Jeffrey S. Neeley, Esq.
Robert Stang, Esq.
Stephen Brophy, Esq.
Jamie Shookman, Esq.

HUSCH BLACKWELL, LLP
1801 Pennsylvania Avenue
NW Suite 1000
Washington, DC 20006
Tel. (202) 378-2357

*Counsel for Export Packers Company Limited*

Dated: July 15, 2024

TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................... 1

    A. Administrative Decision Under Review ...................................................1

    B. Issues Presented ...........................................................................1

II. SUMMARY OF THE ARGUMENT ......................................................... 1

III. STATEMENT OF FACTS ........................................................................ 2

    A. The Antidumping Order on Fresh Garlic ...............................................2

    B. Export Packers' Scope Request ..........................................................3

    C. Commerce's Scope Investigation ........................................................5

    D. Commerce's Scope Determination ......................................................6

IV. STANDARD OF REVIEW ...................................................................... 9

V. ARGUMENT ........................................................................................ 11

    A. The Plain Language of The Fresh Garlic Order And The (k)(1) Factors
       Demonstrate That Export Packers' Garlic Is Excluded From The Scope
       Because It Is "Prepared" By "Heat Processing" .....................................11

       1. The Plain Language Of The Fresh Garlic Order Excludes All
           Garlic "Prepared" by "Heat Processing" .................................... 11

           a. The Term "Prepared" In the Fresh Garlic Order's Exclusion
              Language Means Further Processed .............................. 12

           b. Cooking by Boiling "Prepares" Garlic By Heat Processing......... 13

           c. Export Packers' Garlic is "Prepared" by "Heat Processing"........ 16

    B. Commerce Relied On Inapposite Prior Scope Rulings To Narrow The
       Heat Processing Exclusion To "Roasted" Garlic, Contrary To Its Plain
       Language ....................................................................................19

    C. Commerce's Analysis of (k)(2) Factors Disregarded Key Evidence
       Regarding the Molecular and Structural Changes Imparted by Cooking
       Export Packers' Garlic in Boiling Water, As Well As The Changes To The
       Garlic's Physical Characteristics, Use, Expectations Of Its Users, And
       Advertising..................................................................................23

1.    Physical Characteristics .................................................................... 24

2.    Expectations of the Ultimate Users ................................................... 25

3.    Ultimate Use ...................................................................................... 26

4.    Channels of Trade .............................................................................. 27

5.    Manner of Advertising and Displaying the Product ............................. 28

VI.    CONCLUSION ........................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ArcelorMittal Stainless Belgium N.V. v. United States*,
694 F.3d 82 (Fed. Cir. 2012)..................................................................... 9

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).......................................................................... 10, 11

*Crawfish Processors All. V. United States*,
431 F.Supp.2d 1342 (Ct. Int'l Trade 2006) ............................................ 14

*Crawfish Processors Alliance v. United States*,
483 F.3d 1358 (Fed. Cir. 2007)............................................................. 10

*CS Wind Vietnam Co., Ltd. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016).......................................................... 11, 29

*Diamond Sawblades Manufacturers' Coal. v. United States*,
405 F. Supp. 3d 1345 (Ct. Int'l Trade 2019) ......................................... 23

*Duferco Steel, Inc. v. United States*,
296 F.3d 1087 (Fed. Cir. 2002)........................................................... 9, 13

*Eckstrom Indus., Inc. v. United States*,
254 F.3d 1068 (Fed. Cir. 2001)............................................................. 25

*Gerald Metals Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997).............................................................. 11

*King Supply C. v. United States*,
674 F.3d 1343 (Fed. Cir. 2012)............................................................. 25

*Meridian Products, LLC v. United States*,
851 F.3d 1375 (Fed. Cir. 2017)........................................................ 9, 24, 25

*Midwest Fastener Corp. v. United States*,
435 F.Supp. 3d 1262 (Ct. Int'l Trade 2020) ......................................... 13

*Nature's Touch Frozen Foods (W.) Inc. v. United States*,
639 F. Supp. 3d 1287 (Ct. Int'l Trade 2023) ......................................... 15

*OMG, Inc. v. United States*,
972 F.3d 1358 (Fed. Cir. 2020)............................................................. 13

*Saha Thai Steel Pipe Public Co. Ltd. v. United States,*
   101 F.4th 1310 (Fed. Cir. 2024) ................................................................ 9, 10, 11, 22

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
   163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ................................................. 11, 23

*Smith Corona Corp. v. United States,*
   915 F.2d 683 (Fed. Cir. 1990) ......................................................................... 9, 13

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) ............................................................................................. 10

*Whirlpool Corporation v. United States,*
   890 F.3d. 1302 (Fed. Cir. 2018) ........................................................................... 9

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(vi) ................................................................................. 9

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................... 10

**Regulations**

19 C.F.R. § 351.225 ................................................................................................. 9

19 C.F.R. § 351.225(k)(1) .............................................................................. 1, 6, 10

19 C.F.R. § 351.225(k)(1)(i) ................................................................................... 9

19 C.F.R. § 351.225(k)(1)(ii) ........................................................................... 10, 19

19 C.F.R. § 351.225(k)(2) ................................................................... 1, 8, 10, 23

19 C.F.R. § 351.225(k)(2)(i)-(v) .......................................................................... 23

*Fresh Garlic from the People's Republic of China,* 59 Fed. Reg. 59209, (November 16, 1994)
   (A-570-831) ......................................................................................................... 2

*Notice of Preliminary Determination of Sales at Less Than Fair Value: Fresh Garlic From the*
   *People' Republic of China*, 59 Fed. Reg. 35310 (July 11, 1994) (A-570-831) ..... 12, 13, 18, 23

## I.    INTRODUCTION

On behalf of Export Packers Company Limited ("Export Packers" or "Plaintiff"), we respectfully submit the following brief in support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record.

### A.    Administrative Decision Under Review

The administrative determination sought to be reviewed in this case is the U.S. Department of Commerce's ("Commerce") Final Scope Ruling, *Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Final Scope Ruling on Export Packers' Certain Individually Quick Frozen Cooked Garlic Cloves* (Case No. A-570-831) ("Final Scope Ruling"), issued on February 21, 2024.

### B.    Issues Presented

1. Whether Commerce's decision that Export Packers' scope request regarding the inquiry garlic could not be decided purely on the basis of the "(k)(1) factors" set forth 19 C.F.R. § 351.225(k)(1), when the record provided conclusive and unrebutted evidence establishing that such garlic was "prepared" by "heat processing," was unsupported by substantial evidence and not in accordance with law.

2. Whether disregarding in the analysis of "(k)(2) factors" set forth in 19 C.F.R. § 351.225(k)(1) the conclusive and unrebutted evidence submitted by Export Packers demonstrating that cooking the inquiry garlic in boiling water imparts changes in the molecular structure, chemical content, texture and flavor, and that it is "prepared" by "heat processing," rendered the Final Scope Ruling unsupported by substantial evidence and not in accordance with law.

## II.    SUMMARY OF THE ARGUMENT

This case presents a straightforward question: Should an antidumping duty order that broadly excludes *all* garlic "prepared" by "heat processing" exempt garlic that is molecularly and

structurally altered by being "prepared" (*i.e.,* subjected to a special process or treatment) by being cooked in boiling water (a type of "heat processing")?

Rather than answer this straightforward question based on the order's plain language and unrebutted record evidence, Commerce conducted a misguided analysis of inapposite rulings involving garlic subjected to significantly different processing, or containing facts so vague as to be useless. Commerce simply lost the thread. It ignored the evidence submitted by Export Packers that cooking garlic imparts drastic physical changes at the molecular and structural level.

Under the statutory criteria, Commerce was required to rely only on the (k)(1) factors. Yet even if it were correct in considering the (k)(2) factors, this analysis should not have resulted in an outcome completely at odds with the scope language and the effects of cooking garlic in boiling water. Because Commerce lost track of the purpose of its inquiry, it came to an absurd result. For these reasons, the Court should find that the Final Scope Ruling was unsupported by substantial evidence and not in accordance with law.

## III.    STATEMENT OF FACTS

### A.    The Antidumping Order on Fresh Garlic

This case concerns the scope of the antidumping duty order on *Fresh Garlic from the People's Republic of China. See* 59 F 59209, (November 16, 1994) (A-570-831) ("the Fresh Garlic Order"). The Fresh Garlic Order reads in pertinent part:

> The products subject to the order are all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but *not prepared or preserved by the addition of other ingredients or heat processing*.

(emphasis added).

In particular, this case involves the Fresh Garlic Order's exclusion for garlic "prepared or preserved by the addition of other ingredients or heat processing." As we explain in detail

2

below, this exclusion as a factual matter covers garlic that is cooked at boiling or near boiling temperatures for 90 seconds, such as Export Packers' garlic at issue in the Final Scope Ruling.

**B.    Export Packers' Scope Request**

On March 31, 2023, Export Packers requested a scope ruling to determine whether certain individually quick frozen ("IQF") cooked garlic cloves produced in and imported from China fell within the scope of the Fresh Garlic Order. *Letter from Husch Blackwell LLP to Secretary of Commerce Pertaining to Export Packers' Scope Ruling* Request ("Scope Request") **PR 14**, **CR 3**.

First, the Scope Request explained how the inquiry garlic is "prepared" by "heat processing." Starting with the term "prepared," the Scope Request pointed to a dictionary definition, as well as Explanatory Notes ("ENs") defining several provisions under the Harmonized Tariff Schedule of the United States ("HTSUS"). Scope Request at 7, **PR 14**, **CR 3**. The Scope Request also explained how Commerce has previously used U.S. Customs and Border Protection's interpretation of certain HTSUS provisions to inform the language of the Fresh Garlic Order. Scope Request at 7, **PR 14**, **CR 3** (discussing *Scope Ruling in the Antidumping Duty Order on Fresh Garlic from the People's Republic of China*, (June 25, 2004)) (the "Amexim Scope Ruling"). The term "prepared" in the context of the Fresh Garlic Order, the Scope Request concluded, means garlic that has been subjected to a special process or treatment, and cooking by boiling in water is means by which food products may be prepared. *Id.* at 7-8.

The Scope Request then detailed how the inquiry garlic is prepared by such means, specifically when it is immersed in boiling or near boiling water for 90 seconds. Scope Request at 8-10, **PR 14**, **CR 3**. Export Packers cited as evidence the Expert Report of Eric Block, PhD (the "Block Report") which contained extracts from a publication by Bin Zhang in the Journal of Food Science (the "Zhang Study"). *Letter from Husch Blackwell to Secretary of Commerce*

*Pertaining to Export Packers' Rebuttal Comments on Scope Application* (June 20, 2023)

("Export Packers' Rebuttal Cmts"), Ex. C, **PR 20**.

The Block Report explained that the inquiry garlic cloves are "cooked" in boiling water in that they are irreversibly altered at both the molecular and structural level. The report further explained that this processing significantly and irreversibly reduces the allicin content of the garlic cloves, which is the active flavoring ingredient that provides fresh garlic with its distinctive, pungent taste and aroma. Export Packers' Rebuttal Cmts, Ex. C (Block Report) at 5-9, **PR 20**. Export Packers also submitted a report conducted by Eurofins S-F Analytical Laboratories (the "Eurofins S-F Report"). Scope Request, Ex. E, **PR 14**, **CR 3**. Together, the Block Report and Eurofins S-F Report demonstrated that cooking garlic in boiling water for 90 seconds reduces its allicin content by approximately 98.5% and collapses the cell walls in each glove of garlic to significantly alter its texture. Block Report at Executive Summary; Eurofins S-F Report at 2.

In addition, the Scope Request explained why previous scope rulings on IQF garlic were inapplicable. First, in the Trinity Scope Ruling, the product at issue was "blanched" garlic, not cooked in boiling water like Export Packers' garlic. Scope Request at 11-13, **PR 14**, **CR 3** (discussing *Scope Ruling – Trinity IQF Garlic Gloves – Antidumping Duty Order on Certain Fresh Garlic from the People's Republic of China*, (July 21, 2021)) (the "Trinity Scope Ruling"). Similarly, another ruling involving garlic, the Amexim Scope Ruling, was so vague and lacking in critical information as to be useless in evaluating Export Packers' scope request. Scope Request at 13-14, **PR 14**, **CR 3** (discussing the Amexim Scope Ruling). Notably, Commerce had notified Amexim in the underlying investigation that it required additional information to evaluate its scope request. In response, however, Commerce received "an improperly filed one-

4

page letter" in which "neither the producer nor Amexim explained the [blanching] process in detail, nor what happens to the garlic during the blanching process, nor why the blanching process classifies the garlic as heat processed." Scope Request, Ex. F at 3, **PR 14**, **CR 3**.

In light of the arguments and evidence presented, Export Packers requested that Commerce issue a scope ruling confirming that its goods were outside the scope of the Fresh Garlic Order. Scope Request at 14, **PR 14**, **CR 3**.

### C.    Commerce's Scope Investigation

On May 1, 2023, Commerce formally initiated a scope inquiry to determine whether Export Packers' IQF cooked garlic was within the scope of the Fresh Garlic Order. *Memo from the Department of Commerce Pertaining to Export Packers' Initiation of Scope Inquiry* (May 1, 2023), **PR 15**. Petitioners submitted comments on the scope application on June 7, 2023, and Export Packers submitted rebuttal comments on June 20, 2023. *Petitioners' Comments on Export Packers' Request for a Scope Ruling* (June 7, 2023), **PR 19**; Export Packers' Rebuttal Cmts, **PR 20**.

On August 24, 2023, Commerce issued a Supplemental Questionnaire, to which Export Packers responded on September 12, 2023. *Supplemental Questionnaire for Export Packers Company Limited* (Aug. 24, 2023), **PR 21**; *Responses to Supplemental Questionnaire* (Sept. 12, 2023) ("Supp. Questionnaire Responses"), **PR 25**. Petitioners commented on the questionnaire response on October 3, 2023, and Export Packers submitted a rebuttal on October 10, 2023. *Petitioners' Comments on Export Packers' Supplemental Questionnaire Response* (Oct. 3, 2023), **PR 28**; *Response to Petitioners' Comments on Export Packers' Supplemental Questionnaire Response* (Oct. 10, 2023), **PR 29**.

### D.    Commerce's Scope Determination

On February 21, 2024, Commerce issued its Final Scope Ruling, finding that Export Packers' imports of IQF cooked garlic are covered by the scope of the Fresh Garlic Order.

The Final Scope Ruling first determined that the plain language of the Fresh Garlic Order's scope was not dispositive, as it "does not specify what is meant by the term 'heat processing.'" Final Scope Ruling at 7.

Commerce also analyzed the factors set forth in 19 C.F.R. § 351.225(k)(1), or the "(k)(1) factors,"[1] focusing on the Amexim and Trinity Scope Rulings.  As Commerce itself acknowledged, however, both rulings involved blanched garlic, and "Amexim did not explain its blanching process in detail, what happens to the garlic during the blanching process, and why it is considered heat processing."  Final Scope Ruling at 7.  Commerce ultimately determined that the (k)(1) factors were not dispositive, even though they provided clear guidance that garlic "prepared" by "heat processing" includes garlic cooked in boiling water, and despite Export Packers' unrebutted evidence that this process changes its garlic at the molecular and structural level.  Final Scope Ruling at 7.

Despite the unrebutted evidence provided by Export Packers discussed above, Commerce concluded that the (k)(1) factors did not determine whether the inquiry garlic had been subjected the requisite heat treatment, and it proceeded to the (k)(2) provision of the regulations.  In

---

[1] The primary interpretive sources set forth in 19 C.F.R. § 351.225(k)(1) are: (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue; (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue; (C) Previous or concurrent determinations of [Commerce], including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and (D) Determinations of the [International Trade Commission] pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

addition, despite the admitted lack of detailed evidence in the Amexim Scope Ruling, and the fact that both the Amexim and Trinity Scope Rulings involved blanched garlic, Commerce continued to rely on the rulings in analyzing the (k)(2) factors.

First, in analyzing the "physical characteristics" factor, Commerce found that the Fresh Garlic Order's heat processing exclusion was meant to "'exclude further processed products,' like roasted garlic," citing both the Amexin and Trinity Scope Rulings. Final Scope Ruling at 8. Commerce then differentiated between cooked and roasted garlic and claimed that "Export Packers' boiling of the garlic does not amount to the same level of preparation" as roasted garlic, citing only the Amexim Scope Ruling as support. *Id.* (citing Amexim Scope Ruling at 6). However, Commerce cited no authority demonstrating that only roasted garlic was covered by the heat treatment exclusion.

Commerce also noted the Block Report, Zhang Study and Eurofins S-F Report submitted by Export Packers, and even agreed with their findings that IQF garlic that is cooked in boiling water has a "different aroma, taste, and mouthfeel" than fresh garlic. Final Scope Ruling at 8. However, Commerce overlooked the evidence demonstrating that cooked garlic differs from fresh garlic at the molecular and structural level. As a result, Commerce determined that the physical characteristics factor weighed in favor of finding Export Packers' garlic within the scope of the Fresh Garlic Order. *Id.*

Commerce also failed to address the Block Report, and other evidence submitted by Export Packers, in analyzing the "expectations of the ultimate purchasers" factor. As Export Packers had explained in its response to the supplemental questionnaire, ultimate purchasers expect cooked garlic to have a less pungent taste and aroma than fresh garlic, consistent with cooked garlic's reduced allicin content. Supp. Questionnaire Responses at 7-8, **PR 25**. Once

again, Commerce differentiated between cooked and roasted garlic and determined that only roasted garlic differs from subject merchandise with respect to this factor, thereby ignoring the broad nature of the heat treatment exclusion.  Final Scope Ruling at 8-9.

As for the "ultimate use" factor, Commerce dismissed Export Packers' evidence showing that IQF cooked garlic and fresh garlic are used in different recipes, on the basis that IQF cooked garlic is still used broadly as a food product and for food seasonings.  Final Scope Ruling at 9.

Commerce also concluded that the "channels of trade" factor cast doubt on whether Export Packers' garlic was "prepared" by "heat processing," since both cooked and fresh garlic utilize the same channels of trade.  Final Scope Ruling at 9-10.  In so concluding, however, Commerce never explained why this factor shed any light on the issue of whether the product was heat processed, and it seemed to conclude that fresh garlic and garlic "prepared" by "heat processing" would be retailed through different channels of trade, even though both are food products.  Supp. Questionnaire Responses at 8, **PR 25**.

Finally, in analyzing the advertising factor, Commerce disregarded Export Packers' evidence demonstrating that garlic is advertised based on how it is prepared.  Commerce again distinguished between cooked and roasted garlic, concluding that retailers only distinguish between fresh and *roasted* garlic, not fresh and *cooked* garlic.  Commerce did not explain or discuss that the exclusion at issue only discusses heat-treated garlic, not roasted garlic.  Final Scope Ruling at 10.

Commerce ultimately concluded that the inquiry garlic was within the scope of the Fresh Garlic Order based on "the totality of the record evidence regarding the five factors set forth under 19 CFR 351.225(k)(2)."  Final Scope Ruling at 11.

This appeal followed.

## IV.    STANDARD OF REVIEW

The Court may review a determination by Commerce "as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Such a determination is known as a "scope ruling." 19 C.F.R. § 351.225.

The scope language is the "cornerstone" of Commerce's analysis, and a "predicate for the interpretive process." *Saha Thai Steel Pipe Public Co. Ltd. v. United States*, 101 F.4th 1310, 1324 (Fed. Cir. 2024) (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). "Although the scope of the order can be clarified, the scope language cannot be interpreted or 'changed in a way contrary to its terms.'" *Id.* (quoting *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)).

"If the scope is unambiguous, the plain meaning of the Orders' language governs." *Whirlpool Corporation v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (quoting *Meridian Products, LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017)); *see also ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012) ("the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors previously outlined").

In addition to the scope language, traditional (k)(1) materials are "primary interpretive sources" that Commerce may consider if the scope language does not clearly and sufficiently answer the scope question. 19 C.F.R. § 351.225(k)(1)(i).[2] The (k)(1) sources are the description

---

[2] The Federal Circuit recently explained that "the regulations at least *permit*, if not mandate, Commerce to consider the (k)(1) materials," and when "the parties explicitly rely on the (k)(1) materials for their contradictory interpretation of an order, Commerce cannot arbitrarily ignore those arguments and evidence on the record." *Saha Thai Steel Pipe*, 101 F.4th at 1326 (emphasis in original).

of the merchandise contained in the petition, the description of the merchandise contained in the original investigation, determinations of Commerce (including prior scope determinations) and of the International Trade Commission. Commerce may also consider "secondary interpretive sources" as part of its (k)(1) analysis, including "Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." 19 C.F.R. § 351.225(k)(1)(ii). While the (k)(1) sources may serve as "interpretive aids that clarify or support Commerce's understanding of the scope language," they "cannot control or alter the scope language of the order." *Saha Thai Steel Pipe,* 101 F.4th at 1325.

Only when the (k)(1) sources are not dispositive will Commerce consider the five criteria set forth in 19 C.F.R. § 351.225(k)(2): (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.

The Court holds unlawful any scope determination that is "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States,* 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951).

Substantial evidence is "more than a mere scintilla." *Consol. Edison Co.*, 305 U.S. at 229. "[T]he substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified [the ... determination], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Shandong Rongxin*

*Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249, 1252-53 (Ct. Int'l Trade 2016) (quoting

*Gerald Metals Inc. v. United States,* 132 F.3d 716, 720 (Fed. Cir. 1997)).  Indeed, "[t]he

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight."  *CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016)

(quoting *Gerald Metals*, 132 F.3d at 720); *see also Shandong Rongxin*, 163 F. Supp. 3d at 1252.

## V.    ARGUMENT

The plain language of the Fresh Garlic Order excludes all garlic "prepared" by "heat

processing."  The Final Scope Ruling did not clarify the meaning of these terms.  Rather,

Commerce interpreted and "changed in a way contrary to its terms" the language of this

exclusion, *see Saha Thai Steel Pipe*, 101 F.4th at 1324, and the Court should find that its

determination is unsupported by substantial evidence and not in accordance with law.

### A.    The Plain Language of The Fresh Garlic Order And The (k)(1) Factors Demonstrate That Export Packers' Garlic Is Excluded From The Scope Because It Is "Prepared" By "Heat Processing"

#### 1.    The Plain Language Of The Fresh Garlic Order Excludes All Garlic "Prepared" by "Heat Processing"

In analyzing the heat processing exclusion, Commerce first noted that the Fresh Garlic

Order "does not specify what is meant by the term 'heat processing.'"  Final Scope Ruling at 7.

The next step of Commerce's analysis should have been to analyze the meaning of "prepared,"

since the exclusion covers garlic *prepared* by heat processing.  *See Saha Thai Steel Pipe*, 101

F.4th at 1324 (the scope language is the "cornerstone" of Commerce's analysis).  Instead,

Commerce jumped directly to the (k)(1) sources to determine if any "explicitly describe garlic

being immersed in boiling water such that the garlic was prepared by heat processing."  Final

Scope Ruling at 7.  Then, because none explicitly equated boiling garlic to being "prepared by

heat processing," Commerce determined that the plain language of the Fresh Garlic Order and

(k)(1) sources were not dispositive. *Id.* This finding was unsupported by substantial evidence and contrary to law.

> a. The Term "Prepared" In the Fresh Garlic Order's Exclusion Language Means Further Processed

The term "prepared" is not defined in the Fresh Garlic Order. However, Commerce's preliminary determination in the underlying less-than-fair-value investigation, as well as the dictionary definition of the term, demonstrate that "prepared" in the Fresh Garlic Order broadly refers to any garlic that has been subjected to further processing.

First, Commerce explained in its preliminary less-than-fair-value determination ("Preliminary Determination") on garlic from China that it added exclusionary language to the Fresh Garlic Order for "further processed products":

> The scope description provided above differs from the scope description used by the Department in its notice of initiation of this investigation (59 FR 9470, February 28, 1994). Changes to the scope include (a) the addition of more concise language (and additional HTS subheadings) related to the packaging of the subject merchandise, and (b) additional language to exclude *further processed products*. The revisions are result of comments received from the Customs Service on March 17 and June 30, 1994, and from counsel for petition on June 29 and 30, 1994.

Export Packers' Rebuttal Cmts, Ex. A (*Notice of Preliminary Determination of Sales at Less Than Fair Value: Fresh Garlic From the People' Republic of China*, 59 Fed. Reg. 35310, 35311 (July 11, 1994) (emphasis added)); **PR 20**. The Preliminary Determination's broad reference to "further processed products" demonstrates that Commerce did not intend to limit the exclusionary language to a single type of processing, such as roasting.[3] *See Duferco Steel*, 296

---

[3] Commerce's underlying investigation does not appear to provide further guidance on the meaning of "prepared" in the Fresh Garlic Order. As Commerce stated in a later ruling, "[t]he Final Determination retained the scope language from the Preliminary Determination, and the petition and the International Trade Commission's determination did not address these particular provisions." Scope Request, Ex. F at 4-5 (Amexim Scope Ruling); **PR 14**, **CR 3**.

F.3d at 1097  ("Scope orders are 'interpreted with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order.'") (quoting *Smith Corona Corp.*, 915 F.2d at 685).

In addition, as Export Packers explained in its Scope Request, Merriam Webster defines "prepared" as "subjected to a special process or treatment."  Scope Request at 7, **PR 14**, **CR 3**; Export Packers' Rebuttal Cmts, Ex. B, **PR 20**.  Both Commerce and the Court may also "consult dictionary definitions to assist in determining the plain meaning of a term in an antidumping or countervailing duty order."  *OMG, Inc. v. United States*, 972 F.3d 1358, 1366 (Fed. Cir. 2020) (affirming trial court's determination that importer's anchors were not subject to the antidumping orders on "certain steel nails" based on dictionary definition of "nail"); *see also Midwest Fastener Corp. v. United* States, 435 F.Supp. 3d 1262, 1269 (Ct. Int'l Trade 2020) (relying on dictionary definition of "construct" to assess Commerce's interpretation of the phrase "constructed of two or more pieces" in the antidumping order on certain steel nails).

Importantly, the Meriam Webster definition of "prepared" does not limit the meaning of "prepared" to any specific type of processing, such as roasting.  Moreover, the definition does not conflict with the plain language of the Fresh Garlic Order or any (k)(1) sources.  Like the Preliminary Determination, the dictionary definition demonstrates that the term "prepared" in the Fresh Garlic Order broadly refers to garlic subjected to further processing.

In sum, Commerce should have analyzed the sources described above to determine that the term "prepared" in the Fresh Garlic Order is broadly defined as being subject to "further processing," or subject to a special process or treatment.

   b. Cooking by Boiling "Prepares" Garlic By Heat Processing

It is undisputed that cooking by boiling involves "heat."  As described more below, the process involved in the present case involves immersing garlic in boiling or near-boiling

temperatures.  Indeed, Commerce noted in the Final Scope Ruling that "the inquiry merchandise has different physical characteristics than fresh garlic due to a *heating element*."  Final Scope Ruling at 8 (emphasis added).

Moreover, cooking by boiling constitutes further processing that "prepares" garlic. While the HTSUS and its accompanying ENs are not binding on Commerce, the same terms "prepared or preserved" in the Fresh Garlic Order appear in the HTSUS, *see*, *e.g.*, Chapter 20 (numerous headings), and the treatment of these terms further supports the conclusion that cooking by boiling is a type of processing that "prepares" garlic.  *See also* Scope Request, Ex. F at 4 (Amexim Scope Ruling), **PR 14**, **CR 3** ("a great deal of the language in the scope [of the Fresh Garlic Order] originated with terms taken straight from the Harmonized Tariff Schedule"); *see also Crawfish Processors All. v. United States*, 431 F.Supp.2d 1342, 1349-1350 (Ct. Int'l Trade 2006), *aff'd*, 483 F.3d 1358 (Fed. Cir. 2007) (analyzing the HTSUS to interpret the antidumping order on "prepared and preserved" freshwater crawfish tail meat).

As Export Packers noted in its Scope Request, the inquiry garlic was entered under Subheading 0710.80.7060, HTSUS, which covers "Vegetables (uncooked or cooked by steaming or boiling in water), frozen: Other vegetables: Other: Not reduced in size: Other: Other."  Scope Request at 2, **PR 14**, **CR 3**.  Notably, the "processes" specified in chapter 7 are described later in the HTSUS as "preparing or preserving vegetables," specifically, in Note 1(a) to Chapter 20 (stating that Chapter 20 does not cover "[v]egetables, fruit or nuts, *prepared or preserved* by the processes specified in chapter 7, 8 or 11") (emphasis added).

The fact that vegetables "cooked by steaming or boiling in water" are in Chapter 7, but not Chapter 20, suggests that cooking, steaming and boiling are the very processes to which Note 1(a) refers as "prepared or preserved" vegetables of Chapter 7.  Indeed, in discussing this note,

the U.S. Court of Appeals for the Federal Circuit noted in *R.T. Foods, Inc. v. United States* that the importer had "offered no record evidence that the subject merchandise is *prepared or preserved* by the processes included within HTSUS Chapter 7," as they were not "uncooked or *cooked by steaming or boiling in water*" or "provisionally preserved or dried," suggesting that cooking by "steaming or boiling in water" constitutes being "prepared." 757 F.3d 1349, 1357-1358 (Fed. Cir. 2014) (emphasis added).[4]

Further, as Export Packers explained in its Scope Request, the ENs to Heading 2106, HTSUS specify that the heading for "food preparations" covers:

> Preparations for use, either directly or after processing (such as *cooking,* dissolving or *boiling in water,* milk, etc.), for human consumption. (Emphasis added.)

Scope Request at 7, **PR 14**, **CR 3**. Taken together, Chapter 7, Chapter 20 and the supporting ENs support the conclusion that cooking by boiling in water constitutes a type of processing that "prepares" a food.

In fact, both the Fresh Garlic Order and the HTSUS distinguish between vegetables (or garlic) that are simply frozen and those that are "prepared" and *then* frozen. As noted above, the Fresh Garlic Order covers "frozen" garlic, but not garlic "prepared" by heat processing, including garlic cooked in boiling water before freezing. Similarly, the General ENs to Chapter 7 clarify that the term "frozen" simply means "that the product has been cooked to below the product's freezing point until it is frozen throughout," *i.e.*, not necessarily first cooked in boiling water. Likewise, Heading 0710 distinguishes between frozen vegetables that are either "uncooked" or "cooked by steaming or boiling in water." The ENs to Heading 0710 also state

---

[4] The process of cooking vegetables "by steaming or boiling in water" as specified in Heading 0710 differs from the process of simply freezing, which the Court has held does not "prepare" a product for tariff classification purposes. *See, e.g., Nature's Touch Frozen Foods (W.) Inc. v. United States*, 639 F. Supp. 3d 1287, 1304 (Ct. Int'l Trade 2023).

that frozen vegetables of the heading are "generally obtained at the industrial level by quick-freezing processes," and that "vegetables which have been cooked by steaming or boiling before freezing" remain classified in the heading.  Thus, the ENs, like the tariff provision itself, distinguish between simple freezing, and a process of steaming and boiling before freezing.

For all of these reasons, we submit that cooking by boiling garlic in water constitutes a method of preparing garlic under both the HTSUS, and under the Fresh Garlic Order.

> c.    Export Packers' Garlic is "Prepared" by "Heat Processing"

As explained in its Scope Request, Export Packers' garlic is "prepared" by "heat processing" within the meaning of these terms in the Fresh Garlic Order.  As evidence, Export Packers submitted the expert report of Eric Block, a PhD and Distinguished Professor Emeritus of Chemistry at the University of Albany (the "Block Report").  Export Packers' Rebuttal Cmts, Ex. C, **PR 20**.  Professor Block is an expert on the chemistry of garlic and other alliums, and his experience includes writing a monograph and numerous peer-reviewed scientific papers on various properties and the composition of garlic.  *Id.*

First, the subject garlic cloves are subjected to "heat" when they are immersed in boiling water (100°C) for 90 seconds.  The Block Report detailed how this process irreversibly changes fresh garlic into cooked garlic with a different molecular and structural composition:

> Garlic cloves which have been exposed to water heated to boiling (100°C at sea level) and kept in contact with water at 98-100°C for 90 seconds can be considered to be cooked according to standard dictionary definitions of the term "cook" because the cloves have been *irreversibly altered both at a molecular level and at a structural level*.

Export Packers' Rebuttal Cmts, Ex. C at 9 (Block Report) (emphasis added), **PR 20**.  The irreversible alteration at the "molecular level" is the significant reduction in allicin content.  *Id.* at 1, 7-9.  Allicin, a thiosulfinate, is the active flavoring ingredient that provides fresh garlic its distinctive pungent taste and aroma, and reducing garlic's allicin content results in a "totally

different" taste and aroma.  *Id.* at 8.  The Block Report cited one study demonstrating that fresh garlic has an allicin content of approximately 3,100 ųg (micrograms), whereas immersion in boiling water (100° C) for 30 seconds reduces the allicin content to approximately 3,000 micrograms, immersion for 60 seconds reduces the allicin content to approximately 900 micrograms, and immersion for 90 seconds reduces the allicin content to less than 100 micrograms.  Scope Request at 9, **PR 14**, **CR 3**; Export Packers' Rebuttal Cmts at 5, **PR 20** (discussing Ex. C, Block Report at page 8, Graph B and Zhang Study at 34).[5]  The Block Report concluded that boiling garlic in water for 90 seconds reduces its allicin content by approximately 98.5%.  Block Report at Executive Summary.

The irreversible alteration at the "structural level" described in the Block Report is the change of texture, described as follows:

> At the same time heating the garlic cloves for 90 seconds results in loss of water from the garlic cloves cells and alteration in the starch content and composition, *irreversibly changing the texture of the cloves, constituting definitive structural evidence that the garlic cloves have been "cooked."*

Export Packers' Rebuttal Cmts, Ex. C at 12, **PR 20** (emphasis added).  In sum, immersing fresh garlic cloves in boiling or near boiling water for 90 seconds reduces the garlic's allicin levels to a fraction of their original amounts, thereby changing the fresh garlic's molecular structure, chemical content and texture, as well as the garlic's aroma, taste and use.

Importantly, the process of immersing the garlic in boiling water for 90 seconds differs from the mere blanching of garlic, in that cooking by boiling transforms the product into a

---

[5] These findings were consistent with the Eurofins S-F Report submitted by Export Packers, which determined that blanching garlic cloves by steaming them for 20 seconds reduced their allicin content by only 10.3%, whereas cooking garlic in boiling water for 90 seconds reduced their allicin content by approximately 98.5%.  *See* Scope Request at 9, fn. 2 (discussing Eurofins S-F Report at 4 (Table 2)) and Ex. E, **PR 14**, **CR 3**.

"cooked vegetable" that "cannot be considered fresh garlic."  Export Packers' Rebuttal Cmts, Ex. C (Block Report) at 8, **PR 20** (defining "blanching" as maintaining steam or hot water temperature of 75-95° C for a short period of time).  Specifically, blanching garlic "cleans, brightens and enhances the preservation of the cloves without altering their flavor or aroma potential," whereas cooking garlic in boiling water for 90 seconds or longer "denatures the alliinase enzyme, preventing the formation of allicin when the cloves are cut or crushed."  Block Report at 1.  The distinction between fresh and cooked garlic, the Block Report explained, "reflects the different composition of organosulfur compounds present in fresh and processed garlic."  *Id.* at 5.

A Scanning Electron Microscopy (SEM) Microstructure Analysis confirmed that blanching and cooking garlic are significantly differently processes, which was explained in the Eurofins S-F Report as follows:

> SEM imagery showed differences in microstructure supporting evidence of heat treatment. The raw sample cells appeared the most rigid and intact, the blanched sample cells generally showed less rigid cell structure, and the cells in the cooked sample had a collapsed appearance.

Scope Request, Ex. C (Eurofins S-F Report) at 2, **PR 14**, **CR 3**.  The further processing involved in cooking garlic in boiling water for 90 seconds undoubtedly rises to the level of garlic that is "prepared" by "heat processing."  Indeed, contrary to a simple freezing process, the boiling *cooks* the garlic, irreversibly altering its molecular and structural properties.

In sum, Commerce should have resolved the present scope inquiry in Export Packers' favor, based on the language of the Fresh Garlic Order and (k)(1) factors alone.  As discussed above, the terms "prepared" by "heat processing" broadly refer to further processed products, including garlic cooked in boiling water, as confirmed by Commerce's Preliminary Determination, the Merriam Webster dictionary, the HTSUS and supporting ENs.  Moreover, the

Block Report and Eurofins S-F Report constitute "secondary interpretive sources" pursuant to 19 C.F.R. § 351.225(k)(1)(ii), both of which demonstrate that Export Packers' garlic is significantly altered at the molecular and structural level when it is cooked in boiling water, resulting in a further processed product that should be excluded from the Fresh Garlic Order.

Despite conclusive support for excluding Export Packers' garlic, Commerce determined that the (k)(1) factors were "not dispositive," because "no primary interpretive sources explicitly describe garlic being immersed in boiling water such that the garlic was prepared by heat processing."  Scope Ruling at 7.  In the absence of such magic words in primary interpretative sources regarding this specific type of preparation by heat processing, Commerce ruled against Export Packers, thereby ignoring the broad language of the exclusion and the unrebutted expert evidence establishing that the inquiry garlic had been prepared by a heat treatment.  This determination was unsupported by substantial evidence and not in accordance with law.

### B.    Commerce Relied On Inapposite Prior Scope Rulings To Narrow The Heat Processing Exclusion To "Roasted" Garlic, Contrary To Its Plain Language

Critical to Commerce's determination that Export Packers' garlic is not "prepared" by "heat processing" was Commerce's conclusion that "[t]he purpose of the 'heat processing' exclusion language is to 'exclude further processed products' like roasted garlic."  Final Scope Ruling at 8.  Effectively Commerce changed the requirement that the garlic be prepared by heat treatment to a requirement that it be roasted.  The reference to roasted garlic, however, comes from prior scope rulings citing roasted garlic as a mere *example* of a potentially further processed product, in the context of analyzing blanched—not cooked—garlic.

Commerce first addressed these prior rulings, the Amexim and Trinity Scope Rulings, in examining the (k)(1) factors.  In fact, Commerce initially stated that prior scope rulings were

"not dispositive," because they involved garlic that was blanched, not cooked in boiling water like Export Packers' inquiry garlic.  Final Scope Ruling at 7.

Even though Commerce claimed that the Amexim and Trinity Scope Rulings were "not dispositive," because they did not involve garlic cooked in boiling water, the rulings featured prominently in Commerce's analysis of the (k)(2) factors.  Indeed, Commerce cited to the Amexim Scope Ruling to state that "[t]he purpose of the 'heat processing' exclusion language is to 'exclude further processed products' like roasted garlic."  Final Scope Ruling at 8 (citing the Amexim Scope Ruling at 6 and the Trinity Scope Ruling at 8).  Because cooking Export Packers' garlic in boiling water does not rise to the level of "roasting," Commerce concluded, it does not constitute a "further processed product" excluded from the Fresh Garlic Order.  Final Scope Ruling at 8.  Relying on the Amexim and Trinity Scope Rulings in this manner was clearly contrary to law.

First, as Commerce itself acknowledged, neither ruling involved garlic processed like Export Packers' garlic.  *See* Final Scope Ruling at 7 ("Trinity's IQF garlic cloves were blanched, not boiled," and Amexim's garlic was processed in a manner that "Amexim considered . . . as blanching."). Commerce determined that the inquiry garlic in these rulings was "essentially the same product both before and following the blanching process."  *Id.*  Moreover, Amixim "did not explain its blanching process in detail, what happens to the garlic during the blanching process, and why it is considered heat processing."  Final Scope Ruling at 7 (citing Amexim Scope Ruling at 2 and 6).  In fact, the information upon which the Amexim Scope Ruling was based—including an "improperly filed one-page letter"—was so vague and incomplete that evaluating the nature of the product or processes at issue therein is impossible.  All that should be gleaned

from the Amexim Scope Ruling is that failure to provide complete information may result in an unfavorable scope ruling.

Second, the example of roasted garlic set forth in the cited scope rulings was just that, an example of heat processing, not an attempt to define the exclusionary language writ large. Indeed, the Amexim Scope Ruling first provided roasted garlic as an example of heat processing that "might" be excluded from the Fresh Garlic Order, in contrast to Amexim's blanched garlic that was covered by the scope.  Scope Request, Ex. F (Amexim Scope Ruling) at 6, **PR 14, CR 3**.  The very use of the word "might" indicates that roasted garlic was merely a hypothetical, not an attempt to define the meaning of "prepared" or "heat processing."  Notably, the Amexim Scope Ruling did not cite any support for its assertion that roasted garlic might be excluded from the Fresh Garlic Order, and it clarified that even excluding roasted garlic would depend "on the facts of the case."  *Id.*

Following the Amexim Scope Ruling, the Trinity Scope Ruling simply recited the reference to "roasted" garlic as an example of a potentially further processed product that *might* be excluded from the Fresh Garlich Order.  *See* Scope Request, Ex. F (Trinity Scope Ruling) at 7-8, **PR 14, CR 3**.  The Trinity Scope Ruling provided no additional citations or evidence to suggest that "roasted" garlic was necessarily the level of heat processing required to exclude a product from the Fresh Garlic Order.

Nevertheless, Commerce adopted the reasoning from the Amexim and Trinity Scope Rulings—in particular, their hypothetical examples of what *might* be excluded from the Fresh Garlic Order—as law.  Specifically, Commerce concluded, without citation or authority beyond these two rulings, that Export Packers' garlic is not "prepared" by "heat processing," because it is not processed to the same level as "roasted" garlic.  Fresh Garlic Order at 8.

While Commerce may consider prior scope rulings in interpreting the terms of an order, it is only to the extent such rulings do not "control or alter the scope language of the order." *Saha Thai Steel Pipe,* 101 F.4th at 1325. Here, rather than refer to the Amexim and Trinity Scope Rulings to clarify the Fresh Garlic Order, Commerce relied on a hypothetical discussion therein to limit the Fresh Garlic Order's exclusionary language contrary to its plain terms. Final Scope Ruling at 8; *see also Saha Thai Steel Pipe,* 101 F.4th at 1324 (altering scope language based on (k)(1) factors "is backwards and ignores the paramount weight the scope language carries that the (k)(1) materials do not").

By using the roasted garlic hypothetical to extrapolate the level of processing required for any garlic to qualify as "further processed" or "prepared," Commerce altered the plain language of the exclusionary language. Given the prior rulings' focus on "blanched" garlic, and their lack of any evidence demonstrating that "further processed" products mean "roasted" garlic, the roasted garlic hypothetical should not have factored into Commerce's analysis of Export Packers' inquiry garlic at all. Commerce should have instead differentiated the blanching process at issue in these rulings (whereby garlic becomes "cleaner, and perhaps does not grow as a result of the use of blanching," but remains "essentially the same product both before and following the blanching process," *see* Scope Request, Ex. F (Amexim Scope Ruling) at 6, **PR 14, CR 3**) with garlic that is cooked in boiling water (which transforms the product until it "cannot be considered fresh garlic," *see* Export Packers' Rebuttal Cmts, Ex. C (Block Report) at 8, **PR 20**), to exclude Export Packers' garlic from the Fresh Garlic Order.

**C.    Commerce's Analysis of (k)(2) Factors Disregarded Key Evidence Regarding the Molecular and Structural Changes Imparted by Cooking Export Packers' Garlic in Boiling Water, As Well As The Changes To The Garlic's Physical Characteristics, Use, Expectations Of Its Users, And Advertising**

Once again, Commerce should have relied on the language of the Fresh Garlic Order, as confirmed by the Preliminary Determination, to conclude that Export Packers' garlic is "prepared" by "heat processing."  Because Commerce should have found that the (k)(1) factors are dispositive, an analysis of (k)(2) factors should not have occurred.  *Diamond Sawblades Manufacturers' Coal. v. United States*, 405 F. Supp. 3d 1345, 1354 (Ct. Int'l Trade 2019) ("*only* when the (k)(1) sources fail to clarify the scope of the order can Commerce consider additional materials, such as the physical characteristics of the product and its ultimate use") (citing 19 C.F.R. § 351.225(k)(2)(i)-(v)) (emphasis in original).

Even if Commerce permissibly reached the (k)(2) factors, however, it should not have based its analysis on the Amexim and Trinity Scope Rulings that it had declared to be "not dispositive" earlier in its analysis.  In addition, as explained below, Commerce erred in its (k)(2) analysis by disregarding key evidence submitted by Export Packers that disproved the very essence of its findings.  *Shandong Rongxin*, 163 F. Supp. 3d at 1252 ("substantial evidence must be measured by the record as a whole, including whatever fairly detracts from the substantiality of the evidence.") (internal quotations and citation omitted).  Effectively, Commerce used the (k)(2) factors to read the processed by heat treatment provision out of the scope language.

As discussed above, the (k)(2) factors are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2).  As we explain below, Commerce erred repeatedly in its analysis of these factors.

1.    Physical Characteristics

In analyzing the physical characteristics factor, Commerce noted Export Packers'

significant evidence that cooking garlic in boiling water "irreversibly changes the garlic."  Final

Scope Ruling at 8 (citing Block Report, Eurofins S-F Report, Zhang Study).  However,

Commerce disregarded this evidence on the basis that the garlic is still "used as food or

seasoning," and is still "whole garlic cloves that are frozen," which are also "covered by the

plain language of the scope."  *Id.*  Commerce then reiterated that "[t]he purpose of the 'heat

processing' exclusion language is to 'exclude further processed products,' like roasted garlic,"

citing to the hypothetical example of "further processed products" from the Amexim and Trinity

Scope Rulings.

Commerce's analysis of the physical characteristics factor was blatantly flawed.  First,

the garlic's use should not have informed the analysis of the physical characteristics factor, as

"use" is a separate (k)(2) factor.  Even if "use" could inform the physical characteristics factor,

Commerce fails to identify what type of garlic would be used for something other than food or

seasoning.  In fact, the very example from the Amexim and Trinity Scope Rulings—roasted

garlic—would also be used as food or seasoning.

In addition, the fact that Export Packers' garlic remains "whole garlic cloves that are

frozen" after being cooked in boiling water should not have factored into Commerce's analysis.

While the Fresh Garlic Order's plain language covers whole garlic cloves that are frozen, to

interpret the heat processing exclusion as only applying to goods that are outside the Order's

general scope language for some other reason would render the exclusion superfluous.

*Meridian*, 851 F.3d at 1383 (rejecting interpretation of scope that "fails to consider all of the

terms of the exclusion") (citing *King Supply C. v. United States*, 674 F.3d 1343, 1350 (Fed. Cir.

2012) (interpreting a scope so that it is "informative and non-superfluous") and *Eckstrom Indus.,*

*Inc. v. United States*, 254 F.3d 1068, 1073 (Fed. Cir. 2001) (rejecting a construction that rendered scope terms "mere surplus-age")).

Most importantly, Commerce's analysis of the physical characteristics factor should not have discounted the changes in molecular structure, chemical content, and texture imparted by the cooking of Export Packers' garlic in boiling water. As explained in the Block Report, cooked garlic is "inherently different <u>on a molecular basis</u> than raw garlic." Export Packers' Rebuttal Cmts, Ex. C (Block Report) at Executive Summary, **PR 20** (emphasis in original). The process of cooking garlic changes the physical characteristics of garlic far more than blanching does. As explained in the Block Report, cooking garlic in boiling water for 90 seconds reduces its allicin content by approximately 98.5 percent of the original level. *Id.* Blanching garlic, however, reduces garlic's allicin content by only approximately 10 percent. Scope Request, Ex. E (Eurofins Report) at Table 2, **PR 14**, **CR 3**. This process "only reduces the numbers of contaminating microorganisms and assists in subsequent preserving operations," leaving "essentially the same product both before and following the blanching process." Supp. Questionnaire Responses at 14, **PR 25**.

In short, cooking garlic in boiling water transforms its physical characteristics into an entirely new product with a different taste, aroma and texture that is irreversibly altered at the molecular and structural level. Given these drastic changes, Commerce should have found that the physical characteristics factor weighs strongly in favor of finding Export Packers' garlic outside the Fresh Garlic Order's scope.

2. Expectations of the Ultimate Users

In analyzing this factor, Commerce found no difference in the expectations of users of subject merchandise and Export Packers' cooked garlic. Final Scope Ruling at 8-9. This conclusion is completely contrary to the record.

As Export Packers previously explained to Commerce, the allicin content in garlic is directly responsible for the expectations of the ultimate users.  For example, as demonstrated on "Tasteful Science," a science food blog, the allicin content dictates whether garlic has an "intense burning flavor," such as in raw garlic, or a "milder garlic flavor," such as in cooked garlic.  Supp. Questionnaire Responses, Ex. A, PR 21, **PR 25**.  Similarly, search results on a popular supermarket's website shows that garlic products are advertised in terms of how they are prepared (*i.e.*, "roasted," "cooked," "chopped," "minced") and in some instances, the garlic's pungency (*i.e.*, "mild").  *Id.* at Ex. C.  Thus, the expectations of the ultimate user is entirely dictated by how garlic is prepared, and its effect on flavor and taste.

Commerce, however, dismissed this evidence on the basis that it only distinguished between roasted and fresh garlic, but not cooked and fresh garlic.  This is untrue.  The Tasteful Science blog, for example, refers to the breaking apart of a garlic bulb's plant cells when "garlic is cooked," not simply when garlic is roasted.  *Id.* at Ex. A.  While Export Packers' evidence also shows that users of roasted garlic have different expectations than users of fresh garlic, this is unsurprising, because roasting garlic changes its flavor profile as well.  The relevant point, however, is simply that there is a direct relationship between allicin content— whether the result of cooking or roasting—and the change in taste.  And with Export Packers' garlic, where cooking it in boiling water reduces its allicin content by 98.5, the ultimate users undoubtedly do not expect the garlic to have the "intense burning flavor" of fresh garlic.  As a result, this factor should have also weighed strongly in favor of finding Export Packers' garlic outside of scope.

3.    Ultimate Use

Next, Commerce briefly addressed the ultimate use factor, noting that Export Packers' garlic can be used as an ingredient or seasoning in a variety of fresh and frozen foods and food preparations.  Final Scope Ruling at 9.  Because the Fresh Garlic Order states that "the subject

merchandise is used principally as a food product and for seasoning," Commerce concluded that the use of the inquiry merchandise and subject merchandise is the same. *Id.*

Commerce's analysis of "use" effectively rendered this factor meaningless. Indeed, Commerce does not indicate what non-food purposes garlic would be used for and ignores that roasted garlic—which it appears to concede would be excluded from the scope—would similarly be used as a food product. The fact that excluded garlic may be used in food suggests that this factor should be analyzed at a more granular level. For that reason, Export Packers explained to Commerce that some recipes require garlic with a lower allicin content, whereas other recipes require fresh garlic. Supp. Questionnaire Responses at 9, **PR 25**. Rather than lump together all garlic used as a "food product" or "for seasoning," Commerce should have considered this evidence and determined that cooked garlic has a different use than fresh garlic, which weighs in favor of finding Export Packers' garlic out of scope.

### 4. Channels of Trade

In analyzing this factor, Commerce noted that Export Packers' garlic is "sold through the same primary channels of trade, *i.e.*, further processors, as the subject merchandise." Final Scope Ruling at 9. Commerce concluded that "if downstream processors further cook and integrate the inquiry merchandise into other products," this cast "further doubt that Export Packers' inquiry merchandise was prepared through heat processing when immersed in boiling water." *Id.*

As Export Packers explained to Commerce, however, the channels of trade factor should carry little weight in its analysis, because "cooked garlic and fresh garlic are retailed in many instances through the same channels of trade along with numerous other seasonings, flavorings and food ingredients." Supp. Questionnaire Responses at 8, **PR 25**. And, once again, Commerce did not consider that roasted garlic, which it appears to concede would be excluded

from the scope, would likely also be sold through the same channels. For all these reasons, this factor should not have weighed for or against finding Export Packers' garlic out-of-scope.

### 5. Manner of Advertising and Displaying the Product

Finally, in analyzing the advertising factor, Commerce determined that the inquiry merchandise and subject merchandise are "advertised and displayed in the same manner." Final Scope Ruling at 10. Commerce also claimed that retailers' marketing materials distinguish between roasted garlic and fresh garlic, but not cooked and fresh garlic. *Id.*

Notably, Export Packers demonstrated to Commerce that the packaging of its garlic clearly identifies the product as "cooked." Scope Request, Ex. D, **PR 14**, **CR 3**; Supp. Questionnaire Responses at 4, **PR 25**. Export Packers also submitted additional marketing materials, including the Tasteful Science blog post and search results cited above, that distinguish between cooked and fresh garlic. Supp. Questionnaire Responses, Exs. A-C, **PR 25**. As a result, Commerce should have found that this factor weighs in favor of finding Export Packers' garlic out of scope.

In sum, Commerce, if it used the (k)(2) factors at all, should have found that the (k)(2) factors overwhelmingly demonstrate that Export Packers' cooked garlic is outside the scope of the Fresh Garlic Order. Instead, Commerce disregarded significant evidence demonstrating the drastic physical changes imparted by cooking garlic in boiling water, as well as the changes in use, expectations of the ultimate purchaser, and manner of advertising and displaying the product. Rather than taking into account "whatever in the record fairly detracts" from its findings, *see CS Wind Vietnam Co.*, 832 F.3d at 1373, Commerce instead relied primarily on the roasted garlic hypothetical from the Amexim and Trinity Scope Rulings. As a result, the Final Scope Ruling was unsupported by substantial evidence and not in accordance with law.

## VI.     CONCLUSION

For the reasons set forth above, Commerce's Final Scope Ruling was not supported by substantial evidence and not in accordance with law.  As a result, we respectfully request that the Court hold unlawful Commerce's affirmative finding of circumvention and remand this case for Commerce to revise the Final Determination in accordance with the Court's decision.

Respectfully submitted,

/s/ Jeffrey S. Neeley
Jeffrey S. Neeley, Esq.
Robert Stang, Esq.
Stephen Brophy, Esq.
Jamie Shookman, Esq.
HUSCH BLACKWELL, LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC  20006
(202) 378-2334
jeffrey.neeley@huschblackwell.com

*Counsel for Export Packers Company Limited*

Dated: July 15, 2024

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| EXPORT PACKERS COMPANY LIMITED, | ) |
| ) |
| Plaintiff, | ) |
| ) |
| v. | ) |
| ) |
| UNITED STATES, | ) |
| ) |
| Defendant, | ) |
| ) |
| and | ) |
| ) |
| FRESH GARLIC PRODUCERS | ) |
| ASSOCIATION AND ITS INDIVIDUAL | ) |
| MEMBERS, ET AL., | ) |
| ) |
| Defendant-Intervenors. | ) |
| ) |

Before: The Honorable Jane A. Restani

Court No. 24-00061

## <u>PROPOSED ORDER</u>

On consideration of the motion for judgment on the agency record filed by Export

Packers Company Limited ("Export Packers"), Defendant and Defendant-Intervenor's response,

and all other pertinent papers, it is hereby:

ORDERED that the motion filed by Export Packers is granted, and it is further

ORDERED that the final determination of the U.S. Department of Commerce

("Commerce") is set aside as unlawful, and it is further

ORDERED that Commerce's final determination is remanded for reconsideration in

accordance with the Court's decision.

Dated: _____          _____

New York, New York                              Jane A. Restani, Chief Judge

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the Court's word limitation requirement. The word count for the foregoing brief, as computed by Husch Blackwell's word processing system (Microsoft Word), is 8,826 words.

Dated: July 15, 2024                                          <u>/s/ Jeffrey S. Neeley</u>
                                                                              Jeffrey S. Neeley