## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| EXPORT PACKERS COMPANY LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | Court No. 24-00061 |
| Defendant, ) | |
| and ) | |
| ) | |
| FRESH GARLIC PRODUCERS ASSOCIATION, ) | |
| CHRISTOPHER RANCH, L.L.C., ) | |
| THE GARLIC COMPANY, ) | |
| and VALLEY GARLIC, ) | |
| ) | |
| Defendant-Intervenors. ) | |

## ORDER

Upon consideration of plaintiff's Motion for Judgment on the Agency Record, responses thereto, replies, the administrative record, and upon all other papers and proceedings herein, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the United States Department of Commerce's Final Scope Ruling is sustained in its entirety.

Dated: _____, 2024        _____
        New York, NY                JANE A RESTANI, SENIOR JUDGE

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

_____
                                                    )
EXPORT PACKERS COMPANY LIMITED,    )
                                                    )
                        Plaintiff,                  )
            v.                                      )
                                                    )
UNITED STATES,                             )
                                                    )        Court No. 24-00061
                        Defendant,                )
            and                                     )
                                                    )
FRESH GARLIC PRODUCERS ASSOCIATION,    )
CHRISTOPHER RANCH, L.L.C.,            )
THE GARLIC COMPANY,                   )
and VALLEY GARLIC,                        )
                                                    )
                        Defendant-Intervenors.    )
_____)

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        PATRICIA MCCARTHY
                                        Director

                                        REGINALD T. BLADES, JR.
                                        Assistant Director

OF COUNSEL:
JARED CYNAMON                          RAVI D. SOOPRAMANIEN
Attorney                                Trial Attorney
U.S. Department of Commerce             United States Department of Justice
Office of the Chief Counsel for Trade   Civil Division
Enforcement and Compliance              Commercial Litigation Branch
1401 Constitution Avenue, NW            P.O. Box 480
Washington, D.C. 20230                  Ben Franklin Station
Tel: (240) 306-8756                     Washington, D.C. 20044
Email: Jared.Cynamon@trade.gov          Telephone: (202) 616-0856
                                        Email: Ravi.Soopramanien@usdoj.gov

October 29, 2024                        *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    Administrative Decision Under Review ................................................ 2

    II.    Issues Presented For Review ................................................................ 2

STATEMENT OF FACTS ........................................................................................ 2

    I.    Scope Of The Order ............................................................................. 3

    II.    Merchandise Subject To The Scope Inquiry ....................................... 4

    III.    Scope Inquiry ....................................................................................... 5

SUMMARY OF THE ARGUMENT ....................................................................... 12

ARGUMENT ........................................................................................................... 12

    I.    Legal Standards ................................................................................... 12

        A.    Standard Of Review ................................................................. 12

        B.    Legal Framework For Scope Rulings ....................................... 13

    II.    Commerce's Determination That EPCL's IQF Cooked Garlic Cloves Are Subject To The Order Is Supported By Substantial Evidence And In Accordance With Law ................................................................ 15

        A.    The Plain Language Of The Order ............................................ 16

        B.    The (K)(1) Sources .................................................................. 16

        C.    The (K)(2) Factors ................................................................... 17

            1.    Physical Characteristics ............................................... 17

            2.    Expectations Of The Ultimate Users ........................... 18

            3.    Ultimate Use ................................................................. 18

            4.    Channels Of Trade ........................................................ 18

            5.    Manner Of Advertising And Displaying The Product .................. 19

i

III.    EPCL's Challenges To Commerce Final Scope Ruling Lack Merit ..................... 20

    A.    The Plain Language Of The Order And (K)(1) Sources Are Not Dispositive As To Whether EPCL's IQF Garlic Bulbs Have Been "Prepared" Through "Heat Processing".................................................. 20

    B.    Commerce's Reliance On Prior Scope Rulings In Its (k)(1) Analysis Is Appropriate ................................................................................................ 25

    C.    Commerce Reasonably Determined, Based On The (K)(2) Sources, that EPCL's IQF Cooked Garlic Cloves Are Covered By The Scope Of The Order ...................................................................................................... 29

        1.    Physical Characteristics ................................................................ 29

        2.    Expectations of the Ultimate Users............................................... 31

        3.    Ultimate Use ................................................................................. 33

        4.    Channels of Trade ......................................................................... 34

        5.    Manner Of Advertising And Displaying Of The Product ............. 35

CONCLUSION.................................................................................................... 37

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Aireko Constr., LLC v. United States,*
    547 F.Supp.3d 1350 (Ct. Int'l Trade 2021) .............................................................................. 24

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001) .............................................................................................. 13

*BASF Corp. v. United States,*
    391 F.Supp.2d 1246 (Ct. Int'l Trade 2005) .......................................................................... 22

*Consol. Edison v. NLRB,*
    305 U.S. 197 (1938) .............................................................................................................. 12

*Crawfish Processors Alliance v. United States,*
    431 F.Supp.2d 1342 (Ct. Int'l Trade 2006) .............................................................. 22, 23, 34

*Crawfish Processors Alliance v. United States,*
    483 F.3d 1358 (Fed. Cir. 2007) .............................................................................................. 12

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002) .............................................................................. 21, 26, 28

*Fedmet Resources Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014) .............................................................................................. 15

*Goldilink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................................ 13

*King Supply Co., LLC v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) .............................................................................................. 12

*Meridian Prods., LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) .............................................................. 12, 13, 14, 15

*Nature's Touch Frozen Foods (West) Inc. v. United States,*
    639 F. Supp. 3d 1287 (Ct. Int'l Trade 2023) .......................................................................... 7

*OMG, Inc. v. United States,*
    972 F.3d 1358 (Fed. Cir. 2020) .............................................................................. 13, 14

*Saha Thai Steel Pipe Pub. Co. v. United States,*
    101 F.4th 1310 (Fed. Cir. 2024) .............................................................................. 13, 26

iii

*Sango Int'l L.P. v. United States*,
 484 F.3d 1371 (Fed. Cir. 2007) ................................................................ 15, 21, 26

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
 776 F.3d 1351 (Fed. Cir. 2015) ................................................................ 13

*Smith Corona Corp. v. United States*,
 915 F.2d 683 (Fed. Cir. 1990) ................................................................ 27. 28

*Tak Fat Trading Co. v. United States*,
 396 F.3d 1378 (Fed. Cir. 2005) ................................................................ 15

*U.S. v. Brown*,
 46 C.C.P.A. 1 (U.S. C.C.P.A. 1958) ................................................................ 23

*United Steel and Fasteners, Inc. v. United States*,
 947 F.3d 794 (Fed. Cir. 2020) ................................................................ 15

*Whirlpool Corp. v. United States*,
 890 F.3d 1302 (Fed. Cir. 2018) ................................................................ 14

## STATUTES

19 U.S.C. § 1516a(a)(2)(B)(vi) ................................................................ 12
19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................ 12
19 U.S.C. § 1673e(a)(2) ................................................................ 13

## REGULATIONS

19 C.F.R. § 351.225 (2020) ................................................................ 13
19 C.F.R. § 351.225(d) ................................................................ 15
19 C.F.R. § 351.225(d)(1)(ii) ................................................................ 6
19 C.F.R. § 351.225(e)(2)(i) ................................................................ 8
19 C.F.R. § 351.225(k) ................................................................ 28
19 C.F.R. § 351.225(k)(1) ................................................................ passim
19 C.F.R. § 351.225(k)(1)(i) ................................................................ 14
19 C.F.R. § 351.225(k)(1)(ii) ................................................................ passim
19 C.F.R. § 351.225(k)(2) ................................................................ passim

## OTHER AUTHORITIES

*Antidumping Duty Order: Fresh Garlic from the People's Republic of China*,
 59 Fed. Reg. 59,209 (Dep't of Commerce November 16, 1994) ........................................ 2, 3, 4

*Notice of Preliminary Determination of Sales at Less Than Fair Value: Fresh Garlic From the People' Republic of China*,
 59 Fed. Reg. 35,310, 35,311 (Dep't of Commerce July 11, 1994) ........................................ 4, 22

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review*; 2016-2017,
    84 Fed. R 16,646 (Dep't of Commerce Apr. 22, 2019) ............................................................ 24

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
    86 Fed. Reg. 52,300, 52,323 (Dep't of Commerce Sept. 20, 2021) .................................... 14, 26

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

_____ __

|  |  |  |
|---|---|---|
| EXPORT PACKERS COMPANY LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Court No. 24-00061 |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| FRESH GARLIC PRODUCERS ASSOCIATION, | ) | |
| CHRISTOPHER RANCH, L.L.C., | ) | |
| THE GARLIC COMPANY, | ) | |
| and VALLEY GARLIC, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record (MJAR) filed by plaintiff, Export Packers Company Limited (EPCL).  EPCL's Motion For Judgment On The Agency Record, ECF No. 20 (July 15, 2024) (Pl. Br.).  EPCL challenges the U.S. Department of Commerce's final scope ruling in *Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Final Scope Ruling on Export Packers' Certain Individually Quick Frozen Cooked Garlic Cloves* (Dep't of Commerce February 21, 2024) (Final Scope Ruling).  As demonstrated below, EPCL's motion should be denied because Commerce's ruling is supported by substantial evidence and is otherwise in accordance with law. Accordingly, the United States respectfully requests that the Court deny EPCL's MJAR and sustain Commerce's Final Scope Final Ruling in its entirety.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.**    <u>**Administrative Decision Under Review**</u>

The administrative determination under review is *Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Final Scope Ruling on Export Packers' Certain Individually Quick Frozen Cooked Garlic Cloves* (Dep't of Commerce February 21, 2024) (P.R. 30) (Final Scope Ruling), and the accompanying Issues and Decision Memorandum (IDM).[1]

**II.**    <u>**Issues Presented For Review**</u>

1.    Whether Commerce's determination that the record does not contain dispositive evidence, drawn from consideration of the sources enumerated in 19 C.F.R. § 351.225(k)(1), that the garlic merchandise subject to the scope request (inquiry merchandise) had been "prepared" by "heat processing," is supported by substantial evidence and in accordance with law.[2]

2.    Whether Commerce's determination, based on consideration of the factors enumerated in 19 C.F.R. § 351.225(k)(2), that the inquiry merchandise falls within the scope of underlying order, is supported by substantial evidence and in accordance with law.

<u>**STATEMENT OF FACTS**</u>

On November 16, 1994, Commerce issued an antidumping duty order covering fresh garlic from China. *Antidumping Duty Order: Fresh Garlic from the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't of Commerce November 16, 1994) (*Order*). On March 31, 2023, Commerce received a scope ruling request from EPCL, an importer of fresh garlic from China. *See* EPCL's Letter, "Request for Scope Ruling on Certain Individually Quick-Frozen Cooked

---

[1] "P.R." refers to documents from the public record. "C.R." refers to documents from the confidential record.

[2] "Inquiry merchandise" refers to products subject to the underlying scope ruling request. "Subject merchandise" refers to products subject to the underlying antidumping order.

Garlic Cloves," dated March 31, 2023 (C.R. 3) (P.R. 14) (EPCL's Scope Request).  In its letter, EPCL requested that Commerce find that the Individually Quick Frozen (IQF) cooked garlic cloves[3] that it imports into the United States are not covered by the scope of the *Order*.  *Id*. at 7. On February 21, 2024, Commerce published its Final Scope Ruling, concluding that EPCL's IQF cooked garlic cloves are within the scope of the *Order*.  Final Scope Ruling at 11.

## I.    <u>Scope Of The Order</u>

Commerce defined the scope of the *Order* as:

> all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing.  The differences between grades are based on color, size, sheathing, and level of decay.

> The scope of this *Order* does not include the following:  (a) garlic that has been mechanically harvested and that is primarily, but not exclusively, destined for non-fresh use; or (b) garlic that has been specially prepared and cultivated prior to planting and then harvested and otherwise prepared for use as seed.

> The subject merchandise is used principally as a food product and for seasoning.  The subject garlic is currently classifiable under subheadings:  0703.20.0005, 0703.20.0010, 0703.20.0015, 0703.20.0020, 0703.20.0000, 0703.20.0090, 0710.80.7060, 0710.80.97500, 0711.90.6000, 0711.90.6500, 2005.90.9500, 2005.90.9700, and 2005.99.9700 of the Harmonized Tariff Schedule of the United States (HTSUS).

> Although the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of the *Order* is dispositive.  To be excluded from the *Order*, garlic entered under the HTSUS subheadings listed above that is:  (1) mechanically harvested and primarily, but not exclusively, destined for non-fresh use; or (2) specially prepared and cultivated prior to planting and then harvested and otherwise

---

[3] The name of the inquiry merchandise does not reflect any substantive conclusions made by Commerce concerning the nature of the product.  Instead, Commerce's reference to the inquiry merchandise as "IQF cooked garlic cloves" reflects the label that EPCL used in its scope request.  *See* EPCL' Scope Request at 1 ("… we respectfully request a Department of Commerce ("Commerce" or "DOC") scope ruling on certain individually quick frozen ("IQF") cooked garlic cloves.").

prepared for use as seed must be accompanied by declarations to U.S. Customs and Border Protection to that effect.

59 Fed. Reg. 59,209-59,210 (Nov. 16, 1994). Commerce added the exclusion for products prepared by heat processing in its notice of issuance of the preliminary determination in the underlying investigation. *Notice of Preliminary Determination of Sales at Less Than Fair Value: Fresh Garlic from the People's Republic of China*, 59 Fed. Reg. 35,310, 35,311 (Dep't of Commerce July 11, 1994). The ITC's final determination did not address this exclusion. *See Fresh Garlic from the People's Republic of China*, Inv. No. 731-TA-683 (Final), USITC Pub. 2825 (Nov. 1994). The scope of the *Order* has not changed since its publication in the Federal Register, except for necessary replacements of the relevant HTS reporting numbers. *See Fresh Garlic from China*, Inv. No. 731-TA-683 (Fifth Review), USITC Pub. 5425 (May 2023) at 6.

## II.    <u>Merchandise Subject To The Scope Inquiry</u>

The product at issue is certain IQF cooked garlic cloves. *See* EPCL's Scope Request at 2-3. To produce inquiry merchandise, fresh garlic must first have its roots removed, before being peeled and separated into cloves. The fresh garlic is then cleaned using flowing water and spread single-layered on a perforated steel conveyor belt that travels through a continuous boiling machine for 90 seconds wherein the water is kept at a boiling or near-boiling temperature (98°C - 100°C). Final Scope Ruling at 2; *see* EPCL's Scope Request at 3. The cooked garlic cloves are drained, then undergo a quick-freezing process before being packaged for distribution. Final Scope Ruling at 2; *see* EPCL's Scope Request at 3. IQF cooked garlic cloves were entered into the U.S. market under HTSUS code 0710.80.7060 ("Vegetables (uncooked or cooked by steaming or boiling in water), frozen: Other vegetables: Other: Not reduced in size: Other: Other"). Final Scope Ruling at 2; *see* EPCL's Scope Request at 2.

### III.    <u>Scope Inquiry</u>

On March 31, 2023, EPCL filed its scope ruling application, requesting that Commerce determine that the IQF cooked garlic cloves that it imports into the United States are not covered by the scope of the *Order*.  *See* EPCL's Scope Request at 1-15.  First, EPCL argued that several sources, such as the Explanatory Notes (ENs) of the Harmonized Tariff Schedule of the United States (HTSUS) and the Merriam-Webster Dictionary, support a definition of "boiling" as a "preparation" of vegetables, and that the submersion of IQF cooked garlic cloves in boiling water for 90 seconds constituted a form of "heat preparation" for purposes of the scope of the *Order* because it alters the molecular structure, chemical content, and texture of the cloves involved to a greater degree than blanching, a process that Commerce had previously determined in prior scope rulings as insufficient to constitute "heat processing" within the meaning of the exclusionary language of the *Order*.  *Id.* at 7-12.

Next, EPCL argued that these prior scope rulings, requested by Trinity Distribution Inc. (Trinity), and Coppersmith Inc. and Amexim Inc. (collectively Amexim), were inapposite. Specifically, EPCL argued that *Trinity* was inapposite because it concerned garlic bulbs that had been exposed to a heating element for a shorter time than the inquiry merchandise, whereas the applicants in *Amexim* had "failed to provide nearly all of the information requested" with respect to the garlic cloves in brine merchandise that it imported into the U.S. market.  In *Amexim,* Commerce found the inquiry merchandise to be in-scope notwithstanding that the inquiry garlic was blanched in a manner that, in EPCL's view, constituted a form of heat processing.  *Id.* at 13 (citing Scope Ruling – Trinity IQF Garlic Cloves – Antidumping Duty Order on Certain Fresh Garlic from the People's Republic of China, (July 21, 2021) (*Trinity*) and Scope Ruling –

Coppersmith Inc. and Amexim Inc. Garlic Cloves in Brine - Antidumping Duty Order on Certain Fresh Garlic from the People's Republic of China, (Jun. 25, 2004) (*Amexim*)).

Last, EPCL argued that, although Commerce typically does not rely on rulings or determinations by U.S. Customs and Border Protection (CPB) to be dispositive with respect to Commerce's scope rulings, Commerce in *Amexim* had referred with approval to a statement by CBP in a customs ruling that discussed the meaning of "provisionally preserved" in HTSUS Heading 0711 by relying on the EN for that heading, such that it should look to the ENs for interpretive guidance in this inquiry. *Id*. at 7-8; *see also Amexim* at 5 (citing *Jalapeno Peppers and Other Vegetables Provisionally Preserved*, HQ 957625 (February 8, 1996).

On May 1, 2023, because Commerce did not reject EPCL's scope request or initiate a scope inquiry based on EPCL's application, it was deemed to accept EPCL's Scope Request, and thus initiated the inquiry to which this case relates. 19 C.F.R. § 351.225(d)(1)(ii); *see also* Memorandum, "Deemed Initiation of Scope Inquiry," dated May 1, 2023 (P.R. 15).

On June 7, 2023, the Fresh Garlic Producers Association, and its individual members (petitioners) commented on EPCL's scope ruling application. *See* Petitioners' Letter, "Petitioners' Comments on EPCL's Request for a Scope Ruling," dated June 7, 2023 (Petitioners' Cmts.) (P.R. 19). In their letter, petitioners argued that *Trinity* and *Amexim* were apposite and dictated that whole frozen garlic cloves such as the ones at issue fall within the *Order's* scope. *Id.* at 4-5. Petitioners contended that EPCL's IQF garlic cloves had not been "prepared" by heat processing within the meaning of the *Order*. *Id*. at 5-6. In their view, the IQF cooked garlic cloves could still be put to "multiple appropriate uses and applications as foods" after their submersion in boiling water and had not been altered with an eye towards a

specific use besides general human consumption.  *Id.* at 8-9 (citing *Nature's Touch Frozen Foods (West) Inc. v. United States*, 639 F. Supp. 3d 1287, 1302 (Ct. Int'l Trade 2023)).

Petitioners also argued, citing *Amexim* and *Trinity*, that although boiling alters some of the inquiry garlic cloves' physical characteristics, it did not sufficiently alter them such that they became "a further processed product such as roasted garlic," meaning that the EPCL's boiling process could not properly be considered a form of "heat processing" within the meaning of the scope of the *Order*.  *Id.* at 10 (citing Memorandum, "Scope Ruling in the Antidumping Duty Order on Fresh Garlic from the People's Republic of China," dated June 25, 2004, at 6 (finding that the submersion of garlic cloves in boiling water for five minutes did not constitute heat processing)).  Finally, petitioners observed that the ENs cut against the possibility of boiling constituting a "preparation," insofar as boiling is only mentioned in a parenthetical following the phrase "after processing" in the EN to HTSUS Heading 2106, rendering boiling a process that would occur after a product had already been prepared, such that it would be a "post-preparation process" rather than a means to "prepare" garlic through heat.  *Id.* at 8.

On June 20, 2023, EPCL filed a rebuttal to petitioners' letter.  *See* EPCL's Letter, "Applicant's Rebuttal to Petitioners' Comments," dated June 20, 2023 (EPCL's Rebuttal Cmts) (P.R. 20).  In rebuttal, EPCL made three arguments: (1) the inquiry merchandise was "prepared" and by "heat processing;" (2) Commerce should refrain from relying on the language found in the EN to heading 2106; and (3) *Trinity* and *Amexim* are inapposite because IQF cooked garlic cloves are different products to the garlic clove merchandise in *Trinity*, whereas the applicants in *Amexim* provided insufficient information to enable Commerce to verify that the merchandise in question was out-of-scope, thereby limiting the utility of this ruling.  *See id*. at 2-11.

On August 24, 2023, Commerce issued a supplemental questionnaire to EPCL. *See* Commerce's Letter, "Supplemental Questionnaire for Export Packers Company Limited," dated August 24, 2023 (P.R. 21); *see also* 19 C.F.R. § 351.225(e)(2)(i).

On September 12, 2023, EPCL filed its response to Commerce's supplemental questionnaire. *See* EPCL's Letter, "Responses to Supplemental Questionnaire," dated September 12, 2023 (EPCL's SQR) (P.R. 25). In its response, EPCL reiterated its view that the plain language of the *Order*, in excluding garlic cloves "prepared" by "heat processing," was dispositive, obviating consideration of the additional factors codified in 19 C.F.R. § 351.225(k)(2). *Id.* at 3-4. EPCL also referred to several recipes involving various forms of garlic as illustrative examples of its inquiry product's differing end-use and consumer perception as compared to subject fresh garlic merchandise. *Id.* at 5-8. Further, it asserted that the inquiry merchandise is distributed through a "further processor" system utilized by most garlic producers. *Id.* at 8. Last, it addressed differences in the cooking process it uses to those used by the applicants in *Trinity* and *Amexim*. *See Id.* at 10-14.

On October 3, 2023, petitioners commented on EPCL' supplemental response. *See* Petitioners' Letter, "Petitioners' Comments on Export Packers' Supplemental Questionnaire Response," dated October 3, 2023 (P.R. 28). Petitioners argued that the plain language and sources enumerated in 19 C.F.R. § 351.225(k)(1) were dispositively in favor of the inclusion of EPCL's IQF cooked garlic cloves in the *Order*, making consideration of the additional factors described under 19 C.F.R. § 351.225(k)(2) unnecessary. *See Id.* at 2. Specifically, petitioners argued that the plain text of the *Amexim* scope ruling directed that the phrase "prepared or preserved by heat processing" only modifies the phrase "further processed products" within the *Order*'s text. *Id.* at 3. Petitioners also excerpted language from the *Amexim* ruling contending

that, although blanching in water above 95 degrees had "a heating element" and would prevent

the garlic's growth afterwards, the product, unlike roasted garlic, would remain "essentially the

same product" following the process, leaving it too unchanged to be excluded from the order.  *Id.*

at 3-4 (citing *Amexim* at 6).  Petitioners analyzed certain Customs rulings as an interpretive

source under 19 C.F.R. § 351.225(k)(1)(ii), arguing that they further supported the proposition

that the boiling process at issue did not rise to the level of making garlic into a "further processed

product."  *Id.* at 5-6.  Last, petitioners cited to several Customs rulings that placed garlic bulbs

that had been subjected to more extensive processes than boiling, such as fermentation followed

by toasting, within the scope of the *Order*, indicating that 90 seconds of submersion in boiling

water was inadequate, by comparison, to "process" garlic.  *Id.* at 6-7.

On October 10, 2023, EPCL responded to petitioners' comments.  *See* EPCL's Letter,

"Response to Petitioners' Comments on Export Packers' Supplemental Questionnaire

Response," dated October 10, 2023 (EPCL's SQR Rebuttal Cmts) (P.R. 29).  EPCL averred in its

response that *Amexim* was too vague to support either party's position and referred to

information that EPCL had presented in earlier filings concerning the effect of boiling on the

molecular structure, chemical content, and texture of garlic cloves, which petitioners had

purportedly not addressed in their filings.  *See id.* at 2-3.  Finally, EPCL argued that the CBP

rulings cited by petitioners did not necessarily establish a floor for what products could be

considered in-scope, but rather constituted examples of processes that were deemed to fall

outside the scope of the *Order*.  Accordingly, these rulings did not demonstrate that EPCL's

boiling process resulted in its product being within the scope of the *Order*.

On February 21, 2024, Commerce issued its Final Scope Ruling, concluding that the IQF

cooked garlic cloves imported by EPCL are covered by the scope of the *Order*.  Final Scope

Ruling at 11. Commerce first consulted the *Order's* language, before consulting the primary

interpretive sources identified in 19 C.F.R. § 351.225(k)(1) (referred to collectively hereafter as

"(k)(1) sources"), including the record of the underlying investigation, the final report of the U.S.

International Trade Commission (ITC), and Commerce's own prior scope rulings concerning the

*Order*. After analyzing the *Order's* plain language, Commerce found unclear whether the

exclusion for garlic subjected to "heat processing" encompassed the 90 second immersion in

boiling water process used by EPCL. *Id.* at 1-7. Commerce also found that certain of its prior

scope rulings, namely *Trinity* and *Amexim*, had determined that IQF garlic cloves that had

undergone similar, albeit not identical, processes fell within the scope of the *Order*. *Id.* at 1-7.

Nevertheless, Commerce determined that these findings, read in conjunction with the *Order's*

language, were not dispositive, thus necessitating Commerce's consideration of the additional

criteria enumerated in 19 C.F.R. § 351.225(k)(2) (referred to collectively hereafter as "(k)(2)

factors"), including: (A) the physical characteristics of the merchandise; (B) the expectations of

the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which

the product is sold; and (E) the manner in which the product is advertised and displayed. *Id.* at 7.

Commerce found that, although the physical characteristics of garlic immersed in boiling

water imparted "a different aroma, taste, and mouthfeel" to non-boiled garlic, the inquiry

merchandise remained "garlic that is used as food or seasonings, which are still covered by the

plain language of the scope." *Id*. at 8. Commerce contrasted the boiling process through which

inquiry merchandise is prepared with roasting, a process that Commerce found to rise to the level

of "heat processing" in *Trinity* and *Amexim*. *Id*. Commerce thus concluded that the physical

characteristics of the inquiry merchandise did not disproportionately weigh in favor of finding

the product outside the scope of the *Order*. *Id*.

Turning to expectations of the ultimate purchaser, Commerce found EPCL's contention, that the ultimate purchaser has different expectations of use for inquiry merchandise as compared with subject merchandise, as unsupported by the evidence it filed on this factor, which consisted of recipes and screenshots of a supermarket's website. These recipes and screenshots did not indicate any differentiation between "cooked garlic" and "fresh garlic" products. *Id*. at 8-9. Commerce thus concluded that the record did not indicate that users of the inquiry merchandise have a unique expectation compared to users of subject merchandise. *Id*.

Regarding ultimate use, Commerce found that inquiry merchandise and subject merchandise are both used as an ingredient or seasoning. *Id*. at 9. Turning to channels of trade, Commerce found that 85 percent of EPCL's sales of inquiry merchandise were to a further processor, with the remainder sold to a single distributor whom EPCL believed also sold merchandise to a further processor. *Id*. Commerce thus found that the inquiry merchandise is sold through the same channels of trade as subject merchandise, which is predominantly sold to further processors. *Id*. Commerce concluded that the inquiry merchandise is sold through the same channel and has the same end uses as subject merchandise. *Id*.

Last, Commerce found that evidence submitted by EPCL concerning the manner of advertising and displaying of inquiry merchandise, which consisted of certain marketing materials and screenshots of search results on a supermarket's internet webpage, did not indicate that retailers distinguish inquiry merchandise from subject merchandise. *Id*. at 10. Rather, Commerce observed that the materials and screenshots distinguished between roasted garlic and fresh garlic, which supported its finding that the exclusion language in the scope was intended to exclude roasted garlic as a further processed product "prepared by heat processing." Commerce concluded that the inquiry merchandise could not similarly be considered further processed. *Id*.

For the foregoing reasons, Commerce determined that EPCL's cooked garlic cloves were within the scope of the *Order*. *Id.* at 11. This lawsuit followed.

## SUMMARY OF THE ARGUMENT

Commerce's determination that EPCL's IQF cooked garlic cloves are covered by the scope of the *Order* is supported by substantial evidence and in accordance with law. Because the sources described in 19 C.F.R § 351.225(k)(1) were not dispositive, Commerce properly considered the additional factors under 19 C.F.R § 351.225(k)(2) and correctly determined that EPCL's IQF garlic cloves are covered by the scope of the *Order*.

## ARGUMENT

**I.    Legal Standards**

### A.  Standard Of Review

Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders. *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (internal citations omitted). The Court may review "{a} determination by {Commerce} as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). When a scope ruling is "supported 'by substantial evidence on the record' and otherwise 'in accordance with law,'" the Court must affirm it. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938) ("Substantial evidence is more than a mere scintilla.").

Even if it is possible to draw two inconsistent conclusions from the record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1323 (Fed. Cir. 2024) (quoting *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)). Furthermore, "the {C}ourt may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the {C}ourt would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (internal citations omitted).

**B. <u>Legal Framework For Scope Rulings</u>**

When Commerce publishes an antidumping duty order, it defines the scope and "includes a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2). Because Commerce must write scope language in general terms, Commerce is often called upon to determine whether a certain product is included within the scope of an antidumping or countervailing duty order. *See Meridian Prods.*, 851 F.3d at 1379 (citations omitted). Commerce confronts this question by following the framework and procedures set forth in its regulations, which we describe below. 19 C.F.R. § 351.225 (2020); *see Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing duty orders.").

Commerce first consults the plain language of the order. *See Meridian Prods.*, 851 F.3d at 1381 (explaining that "case law has added another layer to the inquiry" and that Commerce "must begin with the order's scope to determine whether it contains ambiguity and, thus, is susceptible to interpretation" (citations omitted)). If the scope language is unambiguous, then "the plain meaning of the language governs." *OMG, Inc. v. United States*, 972 F.3d 1358, 1363

(Fed. Cir. 2020) (citation omitted).  Scope language is "unambiguous" if the relevant terms have

"a single clearly defined or stated meaning."  *Meridian Prods.*, 851 F.3d at 1381 n.7 (citation

omitted).  "The question of whether a product meets the unambiguous scope terms then presents

a question of fact reviewed for substantial evidence."  *Whirlpool Corp. v. United States*, 890 F.3d

1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods.*, 851 F.3d at 1382).

If the scope language is ambiguous, Commerce may use additional primary and

secondary sources listed in 19 C.F.R. § 351.225(k)(1) to determine the order's meaning.  Primary

(k)(1) sources include descriptions of the product from the underlying petition and original

investigation, as well as previous determinations by Commerce the ITC related to the order at

issue.  19 C.F.R. § 351.225(k)(1)(i).  Secondary (k)(1) sources include other Commerce and ITC

determinations, relevant Customs rulings or determinations, dictionary definitions, industry

usage of terms, and, finally, "any other relevant record evidence."  19 C.F.R. § 351.225(k)(1)(ii).

These (k)(1) sources are intended to be utilized as "interpretive tools to understand the

plain meaning of the scope," rather than being considered "separate{ly} from the initial analysis

of the scope language."  *Regulations To Improve Administration and Enforcement of*

*Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,323 (Dep't of Commerce

Sept. 20, 2021).  Commerce is expected to make use of these sources "at its discretion and under

consideration of the arguments on the administrative record, to determine the meaning of the

scope of the order."  *Id.*  That said, when comparing primary and secondary sources that fall

within the broader umbrella of § 351.225(k)(1), the primary sources enumerated in (k)(1)(i) "will

normally control," when they conflict with secondary sources.  19 C.F.R. § 351.225(k)(1)(ii).

This means that, when a conflict exists between two (k)(1) sources, prior scope determinations

related to a given order and descriptions of the product developed in the petition and during the

investigation that resulted in the order, will control over secondary sources of information, such as customs determinations and dictionary definitions of a given term.

If Commerce determines that an order's plain language, whether alone or as interpreted in light of the (k)(1) sources, is dispositive, Commerce will proceed to issue a final scope ruling regarding whether the inquiry merchandise falls within the order's scope.  *See* 19 C.F.R. § 351.225(d); *see also Tak Fat Trading Co. v. United States,* 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they "definitively answer the scope question."  *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).  The Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as a question of fact under the substantial evidence standard.  *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prods.*, 851 F.3d at 1382 (citing *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).

Only when consideration of the (k)(1) sources is not dispositive will Commerce consider the additional criteria listed as (k)(2) sources.  *See, e.g.*, *Fedmet*, 755 F.3d at 918.  As indicated above, these additional criteria consist of: (A) "{t}he physical characteristics of the product;" (B) "{t}he expectations of the ultimate purchasers; (C) "{t}he ultimate use of the product;" (D) "{t}he channels of trade in which the product is sold;" and (E) "{t}he manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).

## II.    Commerce's Determination That EPCL's IQF Cooked Garlic Cloves Are Subject To The *Order* Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination that EPCL's IQF cooked garlic cloves are subject to the *Order* is reasonable and properly guided by its legal framework for scope rulings.

### A.  **The Plain Language Of The *Order***

Commerce first considered the *Order's* language as well as primary interpretive (k)(1) sources, including the record of the underlying investigation, the final report of the ITC, and Commerce's own prior scope rulings related to the *Order*.  Final Scope Ruling at 7.  After analyzing the *Order's* plain language, Commerce found unclear whether the carveout for garlic merchandise subject to "heat processing" encompassed the boiling process used by EPCL.  *Id*. Thus, Commerce determined that the scope of the *Order* lacked language that would guide a clear interpretation of "heat processing," necessitating consideration of the (k)(1) sources.  *Id*.

### B.  **The (K)(1) Sources**

Commerce analyzed applicable primary sources, which consisted of its prior scope rulings in *Trinity* and *Amexim*.  *Id*.  Commerce determined that none of these prior scope rulings spoke to the issue of whether garlic immersed in boiling water for 90 seconds was prepared by "heat processing."  Commerce found that Trinity's garlic merchandise was blanched, not boiled, and relied on *Amexim*, in which Commerce stated that the inquiry merchandise at issue "is essentially the same product both before and following the blanching process."  Commerce found that, although Amexim's garlic was boiled, Amexim nevertheless characterized this process as blanching.  Moreover, Amexim "did not explain its blanching process in detail, what happens to the garlic during the blanching process, and why it is considered heat processing." Commerce thus determined that neither the *Order*'s language nor consideration of the (k)(1) sources were dispositive on the meaning of "heat processing," necessitating consideration of the (k)(2) factors.  *Id.* at 7.

### C.  **The (K)(2) Factors**

### 1.  **Physical Characteristics**

Commerce's evaluation of physical characteristics focused on how the inquiry merchandize is processed.  *Id*.; *see also* EPCL's Scope Application at 3 ("...the roots are removed, then peeled, and separated into cloves.  The peeled garlic cloves are cleaned using flowing water and then immersed in boiling or near-boiling water (98°C - 100°C) for 90 seconds. The garlic is then drained and undergoes a quick-freezing process.").  EPCL argued that the immersion step irreversibly changes the garlic and is properly considered "prepared or preserved by…heat processing" for purposes of the scope.  EPCL's Scope Request at 10; *see also* EPCL's Rebuttal Cmts at Attachment C; *see also* EPCL's Scope Application at Exhibit E.  Commerce found that, although the inquiry merchandise had certain different characteristics due to exposure to a heating element, Commerce could not consider this merchandise "prepared" by "heat processing."  Final Scope Ruling at 8.  Commerce explained that the purpose of the exclusion language was "to 'exclude further processed products,' like roasted garlic."  Commerce found that the boiling process employed by EPCL did not amount to the same level of preparation.  *Id*.

Commerce also determined, in its examination of the (k)(2) factors concerning the expectations of the ultimate users and the manner of advertising and displaying of the product, that certain marketing materials provided by EPCL in fact supported Commerce's finding that the inquiry merchandise was not a "further processed product" insofar as these materials indicated that downstream processors further cook and integrate the inquiry merchandise into other products.  *See* Final Scope Ruling at 8, 9-10; *see* EPCL's SQR at 8 and Exhibit C.  Thus, Commerce determined that the physical characteristics of the inquiry garlic disproportionately did not weigh in favor of finding this product outside the scope of the *Order*.  *Id*.

17

### 2.  **Expectations Of The Ultimate Users**

Commerce determined that the record lacked indication that users of the inquiry merchandise have unique expectations compared to users of subject merchandise.  Final Scope Ruling at 8-9.  In so doing, Commerce found that "the examples provided by Export Packers do not support its claim that inquiry merchandise and subject merchandise have different expectations of use."  *Id*.  Rather, Commerce found that the materials provided by EPCL in fact supported Commerce's determination that the purpose of the "heat processing" exclusion language is to "'exclude further processed products,' like roasted garlic."  *Id*.

### 3.  **Ultimate Use**

Commerce, relying on EPCL's statement that inquiry merchandise "can be used as an ingredient or seasoning in a variety of fresh and frozen foods and food preparations including soups and broths, dips, purees, sauces, and various bread products," found that the ultimate use of the inquiry merchandise is the same as subject merchandise.  Final Scope Ruling at 9.  Commerce observed in this regard that the *Order* specifically states that "the subject merchandise is used principally as a food product and for seasoning" and EPCL's IQF cooked garlic can be used as an ingredient or seasoning in a variety of fresh and frozen foods and food preparations.  *Id*.

### 4.  **Channels Of Trade**

Commerce found that information on the record concerning channels of trade demonstrated that the inquiry merchandise was sold through the same channels, that is, further processors, as are other fresh garlic products subject to the *Order*.  *Id*.

### 5.  **Manner Of Advertising And Displaying The Product**

Finally, Commerce considered the record information on the manner of advertising and displaying of EPCL's IQF cooked garlic.  *Id*. at 10.  EPCL provided, *inter alia*, an image of its product's packaging, which it considers marketing materials, that identifies the inquiry merchandise as "IQF Cooked Garlic Cloves" and certain retailers' marketing materials to support its contention that retailers selling hundreds of different food products and preparations with garlic take care to identify how the garlic was prepared.  *Id*.; *see* EPCL's SQR at 6 and Exh. C. Commerce determined that the documentation provided by EPCL failed to distinguish between inquiry merchandise and subject merchandise.  *Id* C.  Rather than distinguishing between cooked and uncooked garlic product, as EPCL contends, Commerce found that the marketing materials generally distinguished roasted garlic from fresh garlic.  *Id*.  Commerce thus found that the retailers' marketing materials further supported Commerce's conclusion that the exclusion language in the scope was intended to "exclude further processed products" like roasted garlic, and that the inquiry merchandise, in contrast, was not "prepared by heat processing" to a sufficient degree to render it a further processed product within the meaning of the *Order*.  On this basis, Commerce determined that EPCL's IQF cooked garlic merchandise is advertised and displayed by retailers in the same manner as subject merchandise.  *Id*.

In sum, Commerce determined that inquiry merchandise and subject merchandise (1) share similar expectations of use due to the marketing and advertising of the product; (2) are used as a food or seasoning; (3) are sold to retailers through the same channel of trade (that is, as other seasonings, flavorings, and food ingredients); (4) are marketed to retailers in the same manner; and (5) are not considered "prepared" by "heat processing" when considering the totality of evidence on the record.  *Id*.  Pursuant to its consideration of the (k)(2) factors,

Commerce determined that EPCL's IQF cooked garlic cloves are an in-scope product. *Id.* at 11. Commerce's determination is reasonable and supported by substantial evidence.

**III.    EPCL's Challenges To Commerce Final Scope Ruling Lack Merit**

EPCL argues that (1) the plain language of the *Order* is dispositive, and Commerce should have specifically considered the term "prepared" as it appears in the term "prepared … by … heat processing" before turning to the (k)(1) sources, (2) Commerce improperly relied on its prior scope rulings to narrow its interpretation of "heat processing," and (3) the (k)(2) factors in fact demonstrate that the inquiry merchandise is outside the scope of the *Order*. *See* Pl. Br. 11-29. For the foregoing reasons, however, each of EPCL's arguments lack merit.

**A.    The Plain Language Of The Order And (k)(1) Sources Are Not Dispositive As To Whether EPCL's IQF Garlic Bulbs Have Been "Prepared" Through "Heat Processing"**

EPCL argues that the plain language of the *Order* and the (k)(1) sources are dispositive and that the *Order* excludes EPCL's garlic merchandise from the scope because it is "prepared" by "heat processing." *See* Pl. Br. at 11-19. Specifically, EPCL argues that the plain language of the *Order* excludes all garlic merchandise "prepared" by "heat processing" and that EPCL's garlic product meets this exclusion because it is boiled. *See id.* EPCL's arguments lack merit.

EPCL argues that the term "prepared" is not defined in the *Order*, and that Commerce should have analyzed secondary (k)(1) sources to determine that the term "prepared" as it appears in the *Order* is broadly defined as being subject to "further processing," or subject to a special process or treatment. *See* Pl. Br. 12-13. Relying on this definition of "prepared," EPCL argues that "boiling" necessarily means the inquiry merchandise is prepared, such that its IQF cooked garlic cloves are outside the scope of the *Order* because of the EN descriptions of the terms "prepared or preserved." *See* Pl. Br. 13-16. There are several flaws with this argument.

First, EPCL's definition draws from descriptions of products in the HTSUS, which are of secondary weight compared to primary interpretative sources, including Commerce's prior determinations that boiled garlic is within the scope of the *Order*.  19 C.F.R. § 351.225(k)(1)(ii); *see Amexim* at 7; *see also Trinity* at 9.  To the extent that secondary sources conflict with the primary sources on the record, the primary sources "will normally govern."  19 C.F.R. § 351.225(k)(1)(ii).  EPCL does not provide a persuasive reason for Commerce to ignore its rulings in *Trinity* and *Amexim* to consider the HTSUS.  Both of those rulings identified products that were definitively within the category of "further processed product" and thus out-of-scope, such as roasted garlic, as well as some products, such as blanched garlic, that remained "essentially the same product both before and following the blanching process," and thus in-scope product.  *See* Final Scope Ruling at 8; *see e.g.*, *Amexim* at 6-7; *Trinity* at 8; *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) ("It is the responsibility of the agency, not those who initiated the proceedings, to determine the scope of the final orders.").  They are, accordingly, relevant to Commerce's interpretation of the scope.

Commerce's prior analyses of these garlic products, in the framework of prior scope determinations issued by Commerce in connection with the *Order*, control because they are pertinent primary (k)(1) sources.  *See* 19 C.F.R. § 351.225(k)(1)(ii).  Because EPCL's proffered definition arises from a secondary source, it would not normally control over the primary sources, namely Commerce's prior determinations that boiling and/or blanching do not remove garlic merchandise from of the scope of the *Order*.  *See e.g.*, *Amexim* at 6-7; *Trinity* at 8.

Second, EPCL's proffered definition of "prepared" as referring, broadly, to "further processing," in any event fails to provide any additional clarity on the contours of this term and does not read naturally within the *Order's* exclusionary phrase (that is, "prepared … by … heat

processing") by rendering the term "heat processing" redundant as a process that is necessarily captured by the term "further processing." The language of the scope would thus remain ambiguous using the definition proffered by EPCL, such that a (k)(2) analysis would still be required. *See Sango*, 484 F.3d at 1379 ("{t}hus, we think that to be 'dispositive,' the section 351.225(k)(1) criteria must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question.").

Third, EPCL's preferred definition of "prepared" is at odds with EPCL's arguments during the proceedings before Commerce, when the parties generally agreed that the phrase "prepared," as used in the *Order*, is intended to refer to and, consequently, to exclude some category of garlic merchandise that constitute "further processed" products. *See* Pl.'s Br. at 12; *see e.g.,* 59 Fed. Reg. 35,310, 35,311 (July 11, 1994) (describing the addition of the exclusion intended to "exclude further processed products"); *see also Trinity* at 7.

Fourth, EPCL's attempts to use out-of-context segments of the HTSUS and its ENs to back into a broader definition of the phrase "prepared … by … heat processing," are in tension with the Court's rulings that the term "prepared" and its variant "preparation" are "not defined in the HTSUS or the General Rules of Interpretation." *See Crawfish Processors Alliance v. United States*, 431 F.Supp.2d 1342, 1349 (Ct. Int'l Trade 2006) (quoting *BASF Corp. v. United States*, 391 F.Supp.2d 1246, 1254 (Ct. Int'l Trade 2005)).

In *Crawfish Processors All.*, the Court considered a similar issue regarding the scope of an antidumping duty order covering "freshwater crawfish tail meat, in all its forms . . . regardless of how it is packed, preserved, or *prepared*." The Court was asked to review Commerce's determination that crawfish etouffee did not consist of a preparation of crawfish tail meat within the underlying order's scope. *See id.* at 1349-50. The Court cautioned that "definitions of

preparation are broad and unclear, making application of the definition practically difficult."

*Crawfish Processors All.*, 431 F. Supp. 2d at 1349.  The Court determined that the term

"prepared" generally indicated that "a commodity has been so processed as to be advanced in

condition and made more valuable for its intended use" and usually, although not always, "the

addition of incidental ingredients that do not affect the essential character of the product."  *Id.* at

1349.  Further, the Court stressed that the word "prepared" does not constitute a catch-all for all

forms of food processing, stating that "'every 'prepared' product got that way by a process of

preparation, but *processes* of preparation applied to a product do not necessarily result in that

product being 'prepared{.}'"  *Crawfish Processors All.*, 431 F.Supp.2d at 1350 (quoting *U.S. v.*

*Brown*, 46 C.C.P.A. 1, 7 (U.S. C.C.P.A. 1958)).  The Court's reflections on the term "prepared"

comport with Commerce's consideration of prior scope rulings on the *Order*, which indicates

that term "preparation" is intended to cover a "further processed product," distinguished from a

product that remains "essentially the same product both before and following" the completion of

that process.  *See* Final Scope at 7; *Amexim* at 6-7; *Trinity* at 8.  These rulings support

Commerce's finding that EPCL's boiling process did not rise to a preparation, unlike roasting,

that is a process that can create a further processed product.  Accordingly, EPCL's reliance on the

HTSUS and ENs is misplaced, in introducing ambiguities to the term "prepared."

  Fifth, EPCL's reliance on Commerce's approval of a prior statement by CBP using the

ENs to interpret a term–in a determination that EPCL argues is inapposite, no less–is unavailing

because Commerce generally treats Customs rulings as non-dispositive and non-binding when

interpreting the scope of the antidumping duty orders.  *See Trinity* at 8 ("It is important to note

that Commerce does not consider HTSUS subheadings dispositive in determining . . . an order's

scope, and it has consistently found that CBP rulings are not binding on Commerce's

determinations"); *see also Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review*; 2016-2017, 84 Fed. R 16,646 (Dep't of Commerce Apr. 22, 2019) ("Commerce has consistently found that CBP rulings are not binding."); *Cf, Aireko Constr., LLC v. United States*, 547 F.Supp.3d 1350, 1356 (Ct. Int'l Trade 2021) (holding that Commerce, not CBP, determines the scope of antidumping and countervailing duty orders). This conclusion is also supported by the text of the *Order*, which states that HTSUS subheadings are only attached to the order for "convenience and customs purposes" and Commerce's "written description of the scope of the *Order* is dispositive." Final Scope Ruling at 3.

Finally, EPCL argues that certain reports that it placed on the record, including scientific reports and laboratory analyses, support its contention that the inquiry garlic is outside the scope of the *Order*. *See* Pl. Br. at 16-19. However, the reports that EPCL provided, which are secondary sources, at best, are not controlling, nor do they overturn Commerce's determination that the (k)(1)(i) factors themselves are not dispositive. Final Scope Ruling at 7; *see also* 19 C.F.R. § 351.225(k)(1)(ii) ("…in the event of a conflict between these secondary interpretive sources and the primary interpretive sources … the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue.").

EPCL describes how its garlic cloves are "immersed in boiling water (100°C) for *90 seconds*." Pl. Br. at 16-19 (emphasis added). Yet, in *Amexim*, the inquiry garlic at issue was "boil{ed} . . . for *five minutes* in water with a temperature higher than 95 degrees." *Amexim* at 6 (emphasis added); *see* Final Scope at 7 (Although Amexim's garlic was boiled in 95°C water for five minutes, Commerce still determined that "the garlic 'is essentially the same product both before and following the blanching process' and, as such, is not considered 'prepared … by … heat processing.'"); *see also* EPCL Scope Application at 3 (stating "…the water is kept at a

boiling or near-boiling temperature (98°C - 100°C)."  Accordingly, it follows as logical matter that the garlic cloves described in *Amexim*, having been placed in boiling water for a far longer time at near-equivalent temperatures, would have experienced the same or similar molecular and textural changes as the garlic at issue, given that they would have been exposed to high-temperature water for an even longer time than EPCL's IQF garlic product.  Rather than address this glaring issue, which cuts against its scope request, EPCL seeks to distinguish *Amexim*.

In sum, contrary to EPCL's contentions, the plain meaning of the *Order* is ambiguous and none of the secondary sources relied upon by EPCL are dispositive on the scope of "heat processing."  Moreover, the secondary (k)(1) sources relied upon by EPCL conflict with certain of the primary (k)(1) sources on record, which normally govern whether a product is covered by the scope of the *Order*.  19 C.F.R. § 351.225(k)(1)(ii).  In giving precedence to its prior rulings, Commerce properly determined that none of the (k)(1) sources conclusively demonstrate that the inquiry merchandise is "prepared … by … heat processing."  Final Scope Ruling at 7.  Accordingly, Commerce's determination that an analysis of the (k)(2) factors was necessary is supported by substantial evidence and in accordance with law.

### B. Commerce's Reliance On Prior Scope Rulings In Its (k)(1) Analysis Is Appropriate

EPCL argues that Commerce improperly relied on its prior scope rulings to narrow the term "heat processing" to "roasting."  *See* Pl. Br. at 19-22.  Specifically, EPCL argues that: (1) *Amexim* is inapposite because the requestor failed to provide complete information; (2) the cited scope rulings use only "roasted garlic" as an example; and (3) *Trinity* insufficiently included citations and evidence that "roasted" garlic was "necessarily the level of heat processing required to exclude a product" from the *Order*.  *See id*. at 20-21.  Thus, EPCL contends that Commerce

mistakenly extrapolated "roasting" with the level of processing required for any garlic to qualify as "further processed" or "prepared." *Id.* at 22. EPCL's contention lacks merit.

First, as discussed above, the plain language of the *Order* does not address whether the boiling process described by EPCL constitutes a "preparation" or heat processing. Commerce, therefore, considered the available primary (k)(1) sources on the record, which Commerce's regulation expressly allows it to do when interpreting the scope of an order. *See* 19 C.F.R. § 351.225(k)(1); 86 Fed. Reg. at 52,323 (Sept. 20, 2021); EPCL's Scope Application at Ex. B. In the event of a conflict between primary and secondary (k)(1) sources, primary sources will generally control. *See* 19 351.225(k)(1)(ii).

Commerce reasonably determined, following its examination of the (k)(1) sources, that "no primary interpretive sources explicitly describe garlic being immersed in boiling water such that the garlic was prepared by heat processing." Final Scope Ruling at 7; *see Sango*, 484 F.3d at 1379. In so determining, however, Commerce still found both prior scope rulings insightful because the applicants in the *Amexim* and *Trinity* rulings had referred to their processes as "blanching," the procedures for which, as described in both rulings, are similar to the boiling process at issue in these proceedings. *See e.g.*, *Trinity* at 4; *Amexim* at 2. Both *Trinity* and *Amexim* "reflect the historical context {of the *Order*} and {} provide 'valuable guidance' for the interpretation of the *Order*." *Saha Thai*, 101 F.4th at 1325. Accordingly, Commerce properly reviewed all of the primary interpretative sources at its disposal to interpret the term "heat processing" in the *Order*. *See Duferco*, 296 F.3d at 1097.

Second, although the application for a scope ruling in *Amexim* lacked certain information, that does not render that proceeding and Commerce's findings therein meaningless. The application contained sufficient record information to establish that the inquiry garlic at issue had

been "boil{ed} . . . for *five minutes* in water with a temperature higher than 95 degrees."  *See Amexim* at 2-3, (emphasis added).  EPCL, as stated above, described its garlic cloves are "immersed in boiling water (100°C) for *90 seconds*."  Pl. Br. at 3 (emphasis added); *see* EPCL's Scope Application at 3 (stating "…the water is kept at a boiling or near-boiling (98°C - 100°C)" temperature).  The fact that the inquiry garlic in *Amexim* had been submerged in hot water at nearly the same temperature for a longer time than EPCL's IQF cooked garlic bulbs strongly suggests the latter is comparable to the former for the purposes of this *Order.*  Final Scope Ruling at 7.  Accordingly, based on descriptions of the parallel processes available on the record, Commerce reasonably inferred that the garlic in *Amexim*, having been placed in boiling water longer at equivalent temperatures, would have likely experienced the same or similar molecular and textural changes as the garlic at issue, given that they would have been exposed to water at slightly lower temperatures over triple the amount of time.  *See Amexim* at 6.  EPCL does not refute this.  Thus, the record establishes that *Amexim* and the inquiry at issue both involve the submersion of garlic in water at similar temperatures.

Finally, EPCL contends that Commerce placed too much weight on prior rulings concerning "roast garlic."  Pl. Br. at 22.  However, this arises from the emphasis placed in the prior scope rulings on roasted garlic as an example of a product that falls outside the scope of the *Order*.  *See e.g., Amexim* at 6; *Trinity* at 8 ("the purpose of adding the exclusion language in the Preliminary Determination was to "exclude further processed products," like roasted garlic."). Such examples, which are illustrative, help guide Commerce's determination concerning whether the inquiry merchandise is subject to the scope of the *Order*.  *See Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990) ("The class or kind of merchandise encompassed by a final antidumping order is determined by the order, which is interpreted with the aid of the

antidumping petition, the factual findings and legal conclusions adduced from the administrative

investigations, and the preliminary order.).  The Federal Circuit has held, in this regard, that the

"Commerce Department enjoys substantial freedom to interpret and clarify its antidumping

orders, in accordance with the methodology set forth in its regulation, 19 C.F.R. § 351.225(k)."

*Duferco*, 296 F.3d at 1096.  In addition, "it is the responsibility of the agency, not those who

initiated the proceedings, to determine the scope of the final orders."  *Id. at* 1097.

   In this case, the primary interpretative sources available, *Trinity* and *Amexim*, addressed

blanching and found that blanched garlic merchandise did not fall within the "heat processing"

exception.  *Trinity* at 8.  Further, both rulings indicated that the resulting garlic merchandise is

"essentially the same product before and following the blanching process."  Both rulings thus

explicitly indicate that blanching is insufficient to be considered "prepared … by … heat

processing."  Final Scope Ruling at 7.  Given the similarities between blanching and the boiling

process at issue, Commerce rightfully considered these rulings apposite.

   Moreover, insofar as both scope rulings contemplated roasted garlic as outside the scope

of the *Order*, they did so because roasting is explicitly listed in the scope language as an example

of garlic merchandise excluded from the *Order*.  *See Amexim* at 6; *Trinity* at 7.  In referring to

roasted garlic as an out-of-scope product in its prior rulings, Commerce did not "alter" the plain

language of the exclusion, as EPCL suggests.  Pl. Br. at 22.  Rather, Commerce reasonably relied

on these rulings for guidance in a manner that does not lend itself to the conclusion that

Commerce has effectively circumscribed the "heat processing" exception to instances of

"roasting."  Further, the record manifests that, although Commerce found both rulings

persuasive, it did not treat them as dispositive.  Final Scope Ruling at 7.

### C.  Commerce Reasonably Determined, Based On The (k)(2) Factors, that EPCL's IQF Cooked Garlic Cloves Are Covered By The Scope Of The *Order*

EPCL asserts that Commerce erred in its analysis of each of the (k)(2) factors.  *See* Pl. Br. at 23-28.  EPCL is mistaken in its assertions.  Below, we demonstrate that Commerce's analysis of the (k)(2) factors against the totality of record evidence properly concludes with a determination that EPCL's IQF cooked garlic cloves are subject to the scope of the *Order*.

#### 1.  Physical Characteristics

EPCL asserts that Commerce's analysis of physical characteristics was flawed because (1) Commerce fails to identify what type of garlic would be used for something other than food or seasoning; (2) Commerce incorrectly factored into its analysis that EPCL's garlic remains "whole garlic cloves that are frozen" after being cooked in boiling water; and (3) cooking garlic in boiling water transforms its physical characteristics into an entirely new product with a different taste, aroma and texture that is irreversibly altered at the molecular and structural level. *See* Pl. Br. at 24-25.  These assertions are unavailing, because Commerce reasonably found that the physical changes caused by boiling EPCL's garlic product, which alter the resulting garlic product's aroma, taste, and mouthfeel, nevertheless do not rise to the level needed to constitute "further processed products" of the type contemplated in the *Order*.  Final Scope Ruling at 8.

As a threshold issue, leaving aside the question of whether the IQF cooked garlic cloves were heat-processed, the other physical characteristics of the inquiry garlic cloves on the record supports finding that the inquiry garlic cloves are in-scope.  Specifically, EPCL's scope application describes how the garlic is "peeled and separated into cloves{,} . . . cleaned using flowing water {, then, after the boiling process} undergo a quick-freezing process to produce the IQF cooked garlic cloves."  Final Scope Ruling at 2 (citing EPCL's Scope Application at 2-3).  This description overlaps almost exactly with the scope of the *Order*, which includes "all grades

29

of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance." *Id.* at 2.

As a result, the only physical characteristics at issue are those imparted by the boiling process. Commerce properly examined these physical characteristics in the context of the *Order's* language, as informed by prior rulings such as the *Trinity* and *Amexim*, to determine whether those changes place the inquiry products in or out of the scope of this *Order*. This examination reveals two flaws in EPCL's assertions regarding physical characteristics.

First, changes in a product's cell structure or texture in a vacuum would not, on their own, alter the inquiry garlic's status under the *Order* if they did not rise to a level sufficiently material to trigger an exclusion to the scope of the *Order*. *Trinity* and *Amexim* provide Commerce with an analytical ceiling and floor to evaluate the materiality of these changes: they establish that blanching alone is not sufficient to remove garlic from the scope of the *Order*, whereas further processed products like roasted garlic are more likely to be outside the scope of the *Order*. *See Amexim* at 6; *Trinity* at 8.

Second, the process described in *Amexim* provides a benchmark for a physical process that falls within scope of this *Order*. *See Amexim* at 7. Although Amexim filed an application containing limited information, Commerce had sufficient information from that filing to conclude that the garlic at issue in that proceeding had been "boil{ed} for *five minutes* in water with a temperature *higher than 95 degrees*" and determine that it remained "essentially the same product both before and following the blanching process." *See id.* at 2-3, 6 (emphases added). As we discussed above, the boiling process used by EPCL is broadly similar. Final Scope Ruling at 2 (citing EPCL' Scope Application at 2-3) (emphasis added). Thus, the garlic cloves in *Amexim* would have, after longer exposure to water at equivalent temperatures, experienced

similar physical changes as EPCL's bulbs, yet were still found to have not been heat processed, likely placing them within the scope of the *Order* upon a fuller analysis. The evidence provided by EPCL on the physical differences between its IQF cooked garlic cloves and unprocessed cloves, consisting of an expert report containing extracts from a publication in the Journal of Food Science and the report of a laboratory analysis, *see* Pl. Br. at 2-3, was insufficient to alter the status of the inquiry product for purposes of the scope of the *Order*, especially in light of Commerce's evaluation of the other (k)(2) factors.

## 2. **Expectations of the Ultimate Users**

EPCL asserts that Commerce's analysis of the expectations of the ultimate users ignored record information concerning the importance of the allicin content in garlic, which drives the intensity of garlic flavor and taste and is thus the only factor of relevance to the expectations of the ultimate users. *See* Pl. Br. at 25-26. However, beyond its assertion that boiling significantly reduces allicin content, EPCL fails to provide any evidence that ultimate users of its IQF garlic cloves perceive garlic with lower allicin contents differently from the subject merchandise. EPCL's written submissions assert that the "effects of cooking garlic are well known" and that different varieties of garlic are delineated by "how the garlic was prepared (cooked, chopped, minced, whole cloves, etc.) and . . . whatever processing was utilized." *See*, *e.g.*, EPCL's SQR at 6. However, the three exhibits that EPCL appended in support of "cooked" or "boiled" garlic's existence as distinct categories of garlic product fail to support this assertion.

EPCL relies primarily on the first exhibit, containing an article from the food blog "Tasteful Science" discussing the chemical properties of garlic cloves. *Id.* at Ex. A. The description provided in this blog post provides a recapitulation of the physical qualities of garlic described elsewhere in EPCL's written submissions, discussing, for example, how "{a}llicin is .

. . one of the molecules that is responsible for the burning sensation {in garlic}" and how "{g}arlic contains more long fructose (or fruit sugar) chains than other members of the {allium or onion} family." *Id.* at Ex. A at 3. However, the blog dedicates only one line to discuss how garlic interacts with heat, stating that when garlic is "cooked" the resulting reaction "breaks down the enzyme." The blog does not mention overall consumer perception regarding cooked garlic, let alone whether the difference in allicin content causes consumers to treat or to consume cooked garlic differently than other garlic subject to the *Order*. *See generally id.* at Ex. A.

Nor does the blog post provide an assessment of broader end-user perceptions or consumption patterns of cooked garlic relative to other garlic products. Accordingly, EPCL's rebuttal of Commerce's analysis of consumer expectations appears largely premised on the blog post author's views on the physical processes of cooked garlic. *See* Pl. Br. at 26.

EPCL's second exhibit includes an excerpt of an article available online entitled "27 Best Things to Do with Roasted Garlic." EPCL's SQR at Ex. B. This excerpt speaks exclusively to potential uses for roasted garlic and the process for preparing roasted garlic. *See id.* at Ex. B at 2 ("Roasting garlic is as easy as chopping the top off a head, drizzling it with oil, and popping it in the oven. . . .You can make one of these stunning roasted garlic recipes"). The article thus lacks relevance to Commerce's evaluation of the process of boiling used by EPCL. *See id*.

Finally, EPCL provided a screenshot of search results for "cooked garlic" on the website of the supermarket Wegman's, asserting that it demonstrates that "garlic products are advertised in terms of how they are prepared . . . and in some instances, the garlic's pungency." Pl. Br. at 26; *see* EPCL' SQR at Ex. C. However, as discussed in the Final Scope Ruling, the screenshot only mentions "cooked" garlic as distinct from other garlic products in the context of other foods containing the words "cooked" and "garlic" in their name, regardless of the relation of one to the

other, such as "Wegmans Ready to Cook Garlic Studded Beef Strip Steak, Wegmans Ready to Cook Scallops with Garlic Pesto Sauce, Wegmans Ready to Cook Garlic Herb Shrimp Skewers." Final Scope Ruling at 9 (quoting EPCL' SQR at Ex. C at 1-2). The product subject to Commerce's scope inquiry is distinct from "ready to cook" steaks, scallops, or shrimp. Rather than identifying whether "cooked" garlic such as the inquiry product is a distinct product from garlic generally, the screenshot of these search results simply identify semi-prepared foods that feature garlic as a prominent ingredient or flavor in a larger dish that is ready to be cooked.

Taken together, these three exhibits fail to demonstrate that the ultimate end users of the so-called "cooked garlic" prepared in the manner described by EPCL perceive the inquiry product as distinct from other types or forms of garlic subject to the *Order*, cutting against EPCL's overarching claim that the inquiry product is distinct from in-scope garlic.

### 3.  Ultimate Use

EPCL avers that Commerce's analysis of ultimate use was flawed in "lump{ing} together all garlic used as a "food product" or "for seasoning," without giving any consideration of whether cooked garlic has a different use to fresh garlic. *See* Pl. Br. at 26-27. However, EPCL fails to demonstrate that the cooked garlic product subject to its scope inquiry exists as a distinct product from in-scope garlic. As Commerce explained in the Final Scope Ruling, the ultimate uses initially described by EPCL, "soups and broths, dips, purees, sauces and various bread products (garlic bread, bruschetta, crostini, etc.)," are all examples of uses of garlic as a "food product {or} seasoning," placing them squarely within the scope of the *Order*. *See* Final Scope Ruling at 9 (quoting EPCL' Scope Application at 4 and quoting the *Order*).

Although EPCL points to its Response to a Supplemental Questionnaire to argue for a more granular analysis of specific food applications by allicin content, which would distinguish

cooked from fresh garlic, the analysis it proffers, which relies on certain recipes that purportedly "require garlic with a lower allicin content," does not demonstrate a separate end-use for cooked garlic. *See* Pl. Br. at 27 (citing EPCL' SQR at 9). Rather, EPCL's response contrasts a list of "27 Best Things to Do with *Roasted* Garlic," an out-of-scope product and "30 Recipes You Can Make with *Fresh* Garlic," which is in-scope.

Moreover, while EPCL states that cooked garlic has a "totally different" flavor and scent, the written scope description of the *Order* does not contain exclusions that are based on these parameters. EPCL failed to produce examples of a separate application for cooked garlic cloves outside of the broad applications for garlic products in food preparations, which are not tied to allicin content. ECPL thus fails to demonstrate a separate end-use for the inquiry product.

### 4.  Channels of Trade

EPCL argues that Commerce's analysis of channels of trade should have "carr{ied} little weight in its analysis, because 'cooked garlic and fresh garlic are retailed in many instances through the same channels of trade along with numerous other seasonings, flavorings and food ingredients.'" *See* Pl. Br. at 27-28. However, Commerce reasonably determined that the fact that these "downstream processors further cook and integrate the inquiry merchandise into other products" cuts in favor of the inquiry product's inclusion in the *Order's* scope. Final Scope Ruling at 9. This is especially true considering the definition of "prepared" discussed above, which prior determinations by Commerce have interpreted to encompass only "further processed products" in relation to this *Order*. *See Trinity* at 7. Prior decisions by this Court, discussed above, have found that the term is more likely to encompass food items that had "been so processed as to be advanced in condition and made more valuable for {their} intended use." *See Crawfish Processors All.,* 431 F.Supp.2d at 1349. As a result, this extra layer of processing cuts

against the boiling process employed by EPCL as purportedly constituting a "preparation" within the meaning of the term because the inquiry product was primarily purchased by processors and required additional treatment and processing before its final sale and use.  *See* Final Scope Ruling at 9 ("Specifically, 85 percent of Export Packers' sales of the inquiry merchandise was sold directly to a further processor, with the remainder sold to a single distributor who, EPCL believes, also sold such goods to a further processor.").

Although EPCL states that "numerous other seasonings, flavorings and food ingredients" are also sold through this process, the only example EPCL provided on this factor concerned roasted garlic, which EPCL asserts is sold through the same channels as fresh and cooked garlic. *See* Pl. Br. at 27.  EPCL's evidence concerning roasted garlic did not address whether this out-of-scope product would also be sold through a further processor after undergoing additional processing, such that Commerce had limited and inconclusive information on the record through to determine whether the practice of selling to a further processor is truly as widespread among suppliers of garlic merchandise as EPCL claims.  Consequently, Commerce properly found that this (k)(2) factor weighed in favor of a determination that the inquiry product is in-scope.

### 5.  <u>Manner Of Advertising And Displaying Of The Product</u>

EPCL claims that Commerce's analysis of the manner of advertising and displaying of the inquiry product was flawed because EPCL demonstrated to Commerce that the packaging of its garlic merchandise clearly identifies the product as "cooked," and submitted record information that Commerce failed to consider, namely additional marketing material in its SQR, that distinguished between cooked and fresh garlic.  Pl. Br. at 28.  EPCL's claims are unavailing.

Notwithstanding EPCL's contention that the evidence it submitted in its SQR clearly identifies the inquiry merchandise as "cooked," the record demonstrates that only the packaging

of the inquiry product indicate that the garlic has been "cooked," but no other materials provided by EPCL refer to a discrete category of "cooked" garlic merchandise. *See* Final Scope Ruling at 10. Commerce appropriately gave less weight to this material, which could be self-serving.

EPCL also appended three pieces of marketing material to its SQR. The first was the same blog post discussed above in connection with the expectations of the ultimate user. This post fails to refer to any process of boiling similar to the one employed by EPCL. Rather, it refers to "cook{ing}" in only one line, where the term appears to be used more generically to refer to the process of adding a heating element to garlic. *See* EPCL' SQR at 5, Ex. A at 3 ("When garlic is cooked before it's cut . . . the heat . . .breaks down the enzyme.").

The second piece of marketing material filed by EPCL contains an article that refers to "roasted" rather than "cooked" garlic, which EPCL discusses as an independent category of product. *Id.* at Ex. B at 1-2; *see e.g.*, Pl. Br. at 27 ("Commerce did not consider that roasted garlic"). This article, in addressing a roasting process quite different from that used on the inquiry product, was of limited relevance to Commerce's analysis of the fifth factor. *Compare* EPCL's SQR at Ex. B at 2 (describing the process of roasting garlic) *with* EPCL's Scope Application at 3 (describing the process of boiling Export Packers' garlic).

The third piece of marketing material referenced by EPCL concerns the screenshot of search results on Wegman's website discussed above which, as previously stated, present only prepared food items with the words "cooked" and "garlic" in the same title, rather than featuring the term "cooked garlic" as a name for a distinct food item. *See id.* at Ex. C at 1-2. That website distinguishes roasted garlic from other forms of garlic, which supports roasted garlic's status as a further processed garlic product while failing to distinguish between "inquiry merchandise and

subject merchandise." *See id.*  This information, therefore, supports Commerce's determination that EPCL's garlic product is within the scope of the *Order*.

In sum, consideration of the (k)(2) factors supports Commerce's conclusion that the inquiry product is within the scope of the *Order* given its similarity to other in-scope products and the lack of a unique market presence or end-use for this product.  Consequently, Commerce's Final Scope Ruling is supported by substantial evidence and made in accordance with law.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's MJAR, sustain Commerce's Final Scope Ruling in its entirety, dismiss the complaint, and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

| OF COUNSEL: | /s/ Ravi D. Soopramanien |
|---|---|
| JARED CYNAMON | RAVI D. SOOPRAMANIEN |
| Attorney | Trial Attorney |
| U.S. Department of Commerce | United States Department of Justice |
| Office of the Chief Counsel for Trade | Civil Division |
| Enforcement and Compliance | Commercial Litigation Branch |
| 1401 Constitution Avenue, NW | P.O. Box 480 |
| Washington, D.C. 20230 | Ben Franklin Station |
| Tel: (240) 306-8756 | Washington, D.C. 20044 |
| Email: Jared.Cynamon@trade.gov | Telephone: (202) 616-0856 |
|  | Email: Ravi.Soopramanien@usdoj.gov |

October 29, 2024                              *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that that this brief complies with the word limitation in Court of

International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 11,309

words, excluding the parts of the brief exempted from the word limitation. In preparing this

certificate of compliance, I have relied upon the word count function of the word processing

system used to prepare the brief.

<u>/s/Ravi D. Soopramanien</u>