## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| EXPORT PACKERS COMPANY LIMITED, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) Before: The Honorable Jane A. Restani |
| Defendant, | ) Court No. 24-00061 |
| and | ) |
| FRESH GARLIC PRODUCERS ASSOCIATION AND ITS INDIVIDUAL MEMBERS, ET AL., | ) |
| Defendant-Intervenors. | ) |

## **EXPORT PACKERS COMPANY LIMITED'S REPLY IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Jeffrey S. Neeley, Esq.
Robert Stang, Esq.
Stephen Brophy, Esq.
HUSCH BLACKWELL, LLP
1801 Pennsylvania Avenue NW Suite 1000
Washington, DC 20006
Tel. (202) 378-2357

*Counsel for Export Packers Company Limited*

Dated: December 17, 2024

**TABLE OF CONTENTS**

**Page**

INTRODUCTION and SUMMARY OF ARGUMENT ................................................................... 1

    A.    The Government and Defendant-Intervenors' Attempts to Narrow the Heat Processing Exclusion Defy the Plain Language of the Fresh Garlic Order ............. 1

    B.    Analyzing The Term "Prepared" Under the HTSUS Does Not Elevate Secondary Sources Above "Pertinent Primary (k)(1) Sources" .............................. 4

    C.    The Government Concedes That Commerce Based Its Analytical Framework on the *Amexim* and *Trinity* Scope Rulings, Both of Which Are Lacking in Key Evidence ................................................................................. 6

    D.    The Government Confirms That Commerce Disregarded Key Evidence and Relied on Other Irrelevant Evidence in Its (k)(2) Analysis ........................... 10

II.    CONCLUSION ................................................................................................................ 13

## TABLE OF AUTHORITIES

PAGE(S)

<u>Cases</u>

*Saha Thai Steel Pipe Public Co. Ltd. v. United States*,
   101 F.4th 1310 (Fed. Cir. 2024) .................................................................................... 4

<u>Regulations</u>

19 C.F.R. § 351.225(k)(1) ............................................................................................... 5
19 C.F.R. § 351.225(k)(1)(ii) .......................................................................................... 5
19 C.F.R. § 351.225(k)(2)(ii) ........................................................................................ 12

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On behalf of Export Packers Company Limited ("Export Packers"), we respectfully submit the following reply brief in further support of Export Packers Rule 56.2 Motion for Judgment on the Agency Record, which addresses the U.S. Department of Commerce's ("Commerce") Final Scope Ruling, *Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Final Scope Ruling on Export Packers' Certain Individually Quick Frozen Cooked Garlic Cloves* (Case No. A-570-831) ("Final Scope Ruling"). *See* ECF No. 20 (Pl. Br.).

Export Packers explained in its opening brief that its imported garlic is cooked in boiling water before freezing, and that it should be excluded from the Fresh Garlic Order because it is "prepared" by "heat processing." The Government's response makes one thing clear: Commerce's analysis consisted of blindly following two prior scope rulings — *Amexim* and *Trinity* — with little consideration as to whether they involved similar processes or were supported by any evidence on the record in the scope ruling request now before the Court. Defendant-Intervenor also urges the Court to allow Commerce to side-step an extensive and factually unrebutted record based on the cooking/heat processing of the garlic at issue and instead make a determination based on prior rulings bereft of key evidence involving garlic with dramatically different physical and chemical compositions subject to different processes than that used for the Export Packers' goods at hand. Neither party's responsive arguments have merit.

> A. **The Government and Defendant-Intervenors' Attempts to Narrow the Heat Processing Exclusion Defy the Plain Language of the Fresh Garlic Order**

As Export Packers explained in its opening brief, the Fresh Garlic Order's heat processing exclusion covers *all* garlic subject to further processing by heat. Pl. Br. at 12-13.

1

Both the Government and Defendant-Intervenors try to avoid this clear language and the inevitable conclusion that Export Packers' cooked garlic cloves are excluded from the scope of the Fresh Garlic Order by objecting, unconvincingly, to the supposed breadth of Export Packer's proposed definition and understanding of the relevant exclusionary terms.

First, the Government sets up a straw man by claiming that if Commerce defined the term "heat processing" in the Order to broadly refer to "further processing," that understanding would render "the term 'heat processing' redundant as a process that is necessarily captured by the term 'further processing.'"  Gov. Br. at 21-22.  While the Government's argument is unclear, it appears to complain that the term "further processing" is very broad and sweeps into the exclusion for garlic "prepared by" "heat processing" all types of processing involving heat.  Contrary to the Government's opaque reasoning, though, neither the terms of the Fresh Garlic Order, nor the guidance provided by Commerce, limit this exclusion to any specific type of heat processing.  *See* **PR 20** (Preliminary Determination) (noting that the heat processing exclusion was added to "exclude *further processed products*") (emphasis added).  This is the language that Defendant-Intervenor itself proposed and which Commerce adopted in the Order.  They cannot disavow the conclusion required by the clear and encompassing language of the exclusion merely because that conclusion is at odds with the Government's preferred result.

Defendant-Intervenor, for its part, accuses Export Packers of narrowly focusing its arguments on "a single phrase – 'prepared . . . by . . . heat processing.'"  DI Br. at 7.  Then, it discusses several scope rulings involving uncooked garlic and garlic reduced in size, which Defendant-Intervenor claims establish "straightforward guidelines for interpreting the Order's scope;" for example, guidelines establishing that "blanching does not constitute 'preparation' or 'preservation' by 'heat-treatment' as those terms are used in the Order's scope."  DI Br. at 5.

2

Defendant-Intervenor's argument is problematic on several grounds. First, Export Packers' imported garlic is not reduced in size. Therefore, scope rulings discussing other types of garlic—*i.e.*, the *Van Drunen* Diced Garlic Scope Ruling and the *Trinity* Diced Garlic and Garlic Puree Scope Ruling involving garlic that has been chopped, minced, sliced, or pureed—are inapposite. **PR 19** (*See* Attachments 2 – 3).[1]

Second, Export Packers' garlic is not "blanched." As detailed in Plaintiff's opening brief and supported by expert scientific analysis, blanched garlic differs from cooked garlic, in that "blanching garlic" is a process that does not alter the flavor or aroma of the garlic "whereas cooking garlic in boiling water for 90 seconds or longer 'denatures the alliinase enzyme, preventing the formation of allicin when the cloves are cut or crushed.'" Pl. Br. at 17-18. As noted in the Block Report (Applicants rebuttal to Petitioners' Comments, Attachment C at 12 (PR20) "Blanching is significantly different from cooking, which in the case of garlic cloves occurs upon heating in boiling water for longer periods of time, e.g., 90 seconds or longer."

Allicin is "the active flavoring ingredient that provides fresh garlic its distinctive pungent taste and aroma." Pl. Br. at 16. Cooking the subject garlic cloves by submersing them in boiling water for 90 seconds reduces the garlic's allicin content from approximately 3,100 micrograms to less than 100 micrograms, a reduction of approximately 98.5%. In that regard, Export Packers' cooking process fundamentally transforms the garlic's chemical composition and structure at the molecular level: its taste, aroma, starch content and texture. Pl. Br. at 17-18. There is no information on the record indicating that blanching garlic has the same effect on

---

[1] Defendant-Intervenors also reference a scope ruling request submitted on behalf of Dongsheng Foods USA, Inc. ("Dongsheng") involving IQF diced garlic "inclusive of chopped, minced, sliced, pureed" goods. **PR 19** (*See* Attachment 1) ; Def.-Int. Response Brief at 4. Commerce rejected Dongsheng's scope ruling application as incomplete and Dongsheng never resubmitted its application for a scope ruling with Commerce. As such, it is not clear why Defendant-Intervenors have submitted this incomplete scope ruling request on inapposite goods or why they believe that it should be accorded any weight in this inquiry.

3

garlic cloves as cooking the cloves. In that regard, the Block Report defines " 'blanching' garlic as a process that merely cleans, brightens and enhances the preservation of the cloves without altering their flavor or aroma potential…." Pl. Br. at 18. *See also* **PR 20** (Attachment C, Executive Summary). And, notably, the Government repeatedly refers to Export Packers' imported garlic as "cooked." *See*, *e.g.*, Gov. Br. at 4, 5 and 6. Thus, any so-called "guidelines" gleaned from prior scope rulings that may exist with respect to blanched garlic are irrelevant with respect to Export Packers' cooked garlic cloves.

In short, neither the Government nor Defendant-Intervenor provide any convincing reason, based on either the record or the clear language of the Order, for interpreting the Fresh Garlic Order's heat processing exclusion in a manner that limits the exclusion contrary to the Fresh Garlic Order's plain language. To do so would impermissibly change "in a way contrary to its terms" the language of this exclusion. *Saha Thai Steel Pipe Public Co. Ltd. v. United States*, 101 F.4th 1310, 1324 (Fed. Cir. 2024). For the reasons explained above and in Export Packers' opening brief, this exclusionary language broadly refers to any garlic prepared by being subjected to heat processing. That construction requires excluding Export Packers' cooked garlic cloves from the scope of the Fresh Garlic Order and neither the Government nor Defendant-Intervenor should be permitted to raise specious arguments based upon unsupported conclusions and nonexistent evidence in order to obtain a contrary result.

    **B.**    **Analyzing The Term "Prepared" Under the HTSUS Does Not Elevate Secondary Sources Above "Pertinent Primary (k)(1) Sources"**

The Government also makes the unfounded claim that Export Packers seeks to elevate "secondary" product descriptions under the Harmonized Tariff Schedule of the United States ("HTSUS") over "primary" prior scope rulings. Gov. Br. at 21.

4

While Customs rulings or determinations are "secondary interpretive sources" in a scope inquiry, importantly, they are still (k)(1) sources that take precedence over (k)(2) sources. *See* 19 C.F.R. § 351.225(k)(1)(ii) (Commerce "may also consider . . . Customs rulings or determinations"). In that regard, there is nothing in Section 351.225(k)(1) that prevents Commerce from evaluating secondary interpretive sources in a scope ruling request. Indeed, in a number of instances Commerce has taken HTSUS issues into account when conducting a (k)(1) analysis with respect to a fresh garlic scope ruling request. **PR 19 (***See Van Drunen* Scope Ruling, Attachment 2 at 9**)** () **PR 14 (**Export Packers Scope Ruling Request, Exh. F: *Amexim* Scope Ruling at 4 – 6) .

With respect to the *Amexim* and *Trinity* scope rulings, on the other hand, Commerce itself determined that they were "non-dispositive" in its (k)(1) analysis, and it primarily considered these prior scope rulings in its (k)(2) analysis.[2] *See* Final Scope Ruling at 7-8, fn. 49, 50, 54-55. Given the dispositive nature of the (k)(1) sources identified in Export Packers' Scope Ruling Request; its Response to Commerce's Supplemental Questionnaire; and its Rebuttal to Petitioners' Comments (**PR14, 20, 25, 29**) we believe that considering the *Amexim* and *Trinity* scope rulings pursuant to a (k)(2) analysis in this instance went beyond what is required or appropriate under the regulations.

Contrary to the Government's contention, the interpretation of "prepared" under the HTSUS should have provided important guidance in Commerce's (k)(1) analysis. As Export Packers explained in its opening brief, both the Fresh Garlic Order and the HTSUS distinguish

---

[2] Defendant-Intervenor also claims that Export Packers *created* the ambiguity that caused Commerce to proceed to a (k)(2) analysis. Def. In. Br. at 10 ("Commerce, however, determined these {(k)(1)} sources were not dispositive based on the evidence Plaintiff submitted . . ."). This allegation misconstrues the statutory structure. Commerce conducts a hierarchical analysis in a scope inquiry, and record evidence submitted by Export Packers could have been considered as "other relevant record evidence" in its (k)(1) analysis. 19 C.F.R. § 351.225(k)(1)(ii).

between vegetables (or garlic) that are simply frozen and those that are "prepared" and *then* frozen. *See* Fresh Garlic Order at General Scope Language and General ENs to Chapter 7; *see also* ENs to Heading 0710 (distinguishing between vegetables that are frozen by the "quick freezing processes," and "vegetables which have been *cooked by steaming or boiling before freezing*")(emphasis added). Pl. Br. at 14-16. This distinction supports our conclusion that cooking garlic in boiling water is a process that "prepares" garlic by heat processing.

The Government is flatly mistaken that Export Packers asked Commerce to "ignore its rulings in *Trinity* and *Amexim* to consider the HTSUS." Gov. Br. at 21. To the contrary, Commerce itself found these rulings "non-dispositive" in its (k)(1) analysis. This also was Export Packers' position. As a result, the clear language of the tariff (the HTSUS) should have constituted another (k)(1) source which, if properly considered, strongly supported interpreting the Fresh Garlic Order to exclude garlic cooked by being boiled, a process squarely within the Fresh Garlic Order's exclusion for goods prepared by heat processing.

> C. **The Government Concedes That Commerce Based Its Analytical Framework on the *Amexim* and *Trinity* Scope Rulings, Both of Which Are Lacking in Key Evidence**

As Export Packers explained in its opening brief, Commerce should have based its analysis on the relevant scope language and (k)(1) factors alone. Instead, it proceeded to a (k)(2) analysis, using the roasted garlic hypothetical from *Amexim* and *Trinity* to extrapolate the level of processing required for *any* garlic to qualify as being "prepared" by "heat processing."

The Government does not contest that Commerce used the roasted garlic example from the prior scope rulings to dictate its analysis of Export Packers' cooked garlic. In fact, it contends that "*Trinity* and *Amexim* provide Commerce with an analytical ceiling and floor to evaluate the materiality of {the} changes {imparted by heat processing}" and "establish that blanching alone is not sufficient to remove garlic from the scope of the *Order*, whereas further

6

processed products like roasted garlic are more likely to be outside the scope of the *Order*." Gov. Br. at 30.

As an initial matter, the Government's "floor" and "ceiling" analogy makes no sense, because blanching and roasting are not simply different levels of heat processing on a continuum. Indeed, no level of blanching will ever result in roasted garlic since these two processes have a different effect on garlic cloves at the molecular and structural levels.

Commerce's reliance on these rulings is particularly shocking given their lack of evidence, inapposite facts and the Government's concession that Commerce did not have evidence supporting the factual basis of those rulings on the record supporting the Export Packers scope ruling, but instead had to *infer* (or perhaps more accurately, speculate), on the type of changes imparted by the heat processing involved.

In *Amexim* the petitioner described the garlic cloves in question as "blanched and pickled." Thereafter, Commerce "asked Amexim to explain the blanching process in detail, what happens to the garlic during the blanching process, the purpose of the blanching process, and why it believes that the blanching process classifies as heat processing." **PR 14** (Exhibit C, *Amexim* Scope Ruling at 2). Commerce received a partial response to its request for information and commented:

> With respect to questions about the blanching process, despite our requests, neither the producer nor Amexim explained the process in detail, what happens to the garlic during the blanching process, nor why the blanching process classifies the garlic as heat processed. Amexim only explained that the purpose of the blanching process is to rid the garlic clove's surface of peroxidase and to stop the garlic from sprouting.

*Amexim* subsequently resubmitted its request for a scope ruling, but failed to provide any additional information on the blanching process. *Id.* at 3. The *Amexim* ruling also stands out due its claim that the garlic cloves in that ruling were "blanched in boiling water for five minutes."

7

The well documented scientific studies provided by Export Packers establish conclusively that boiling a garlic clove for 90 seconds cooks the clove, resulting in an allicin reduction of approximately 98.5% as well as changes to the cellular wall structure of the garlic cloves, thereby dramatically changing the garlic cloves aroma, taste and texture.  (PR14) (Exhibit E, Eurofins SF Analytical, Inc. Report at Page 4 of 19; Block Report Executive Summary; Zhang Study at 34).  Respectfully, the results of the Eurofins Report, Block Report and Zhang Study cannot be squared with the entirely unsupported claim in *Amexim* that boiling the garlic cloves for five minutes merely "blanched" the cloves and cleaned their surface.  Based on the scientific evidence presented by Export Packers and the total lack of any evidence concerning the alleged "blanching" in the *Amexim* ruling it is fair to question the veracity of the information provided and ask what weight, if any, should be provided to the information in that ruling.

In the *Trinity* scope ruling the petitioner stated that the garlic cloves were "blanched by being hot steamed for 20-30 seconds at a temperature of over 95 degree Celsius."  **PR 14** (Exhibit F (*Trinity* IQF Garlic Cloves Scope Ruling at 3, fn17)).  Nevertheless, other than this brief description of the processing – which distinguishes Trinity's blanched garlic cloves from Export Packers' cooked garlic cloves – the ruling provides no additional documentation or evidence concerning the processing in question.  What was the effect of the 20 – 30 second blanching process on the allicin content of the garlic cloves?  What difference did it make in the taste and aroma profiles of those goods?  And how did that process change the cell walls of the garlic cloves and thereby the garlic cloves' texture?

The Government claims that Commerce "reasonably *inferred* that the garlic in Amexim . . . would have likely experienced the same or similar molecular and textural changes as the garlic at issue."  Gov. Br. at 27 (emphasis added).  That unscientific and unsupported inference

8

concerning blanched garlic and cooked garlic is at odds with all of the scientific studies and evidence presented. As stated in the Block Report:

> Blanching is significantly different from cooking, which in the case of garlic cloves occurs upon heating in boiling water for longer periods of time, e.g. 90 seconds or longer. **PR 20** (Attachment C, Expert Report of Eric Block, PhD at12).

Similarly, the report prepared by Eurofins SF Analytical, Inc. ("the Eurofins SF Analytical Report") includes specific evidence and laboratory test results confirming that while the difference between raw garlic and blanched garlic prepared using the method described in *Trinity* "was negligible," "the comparison [of raw garlic and blanched garlic] with "cooked [garlic] is significant". **PR 14** (Exhibit E, Eurofins SF Analytical, Inc. Report at Page 4 of 19). In that regard, the Eurofins SF Analytical Report's analysis of Export Packer's garlic found that "raw and blanched garlic showed similar high levels of allicin from 610.1-680.5 mg/kg while cooked garlic showed very low results of 10.0 mg/kg." *Id.* In other words, in this report blanching the fresh garlic reduced its allicin level by approximately 10% (610.1 / 680.5 = 10.34%); however, cooking the garlic reduced its allicin level by nearly 99% (10.0 / 680.5 = 98.53%), a reduction nearly 1000% greater than the allicin reduction by blanching.

The Eurofins SF Analytical Report also supported its conclusions concerning raw garlic, blanched garlic and cooked garlic with a Scanning Microscopy (SEM) Microstructure Analysis and stated:

> SEM imagery showed differences in microstructure supporting evidence of heat treatment. The raw sample cells appeared the most rigid and intact, the blanched sample cells generally showed less rigid cell structure, and the cells in the cooked sample had a collapsed appearance. *Id*. At Page 2 of 19.

In short, no *evidence* has been provided establishing the materiality of the changes to the garlic in *Amexim* and *Trinity*, as both scope rulings are devoid, or nearly so, of any verifiable description, detailed or otherwise, of the processing involved. In fact, as noted in Export

9

Packers' opening brief and consistent with the discussion provided above, the only evidence of the heat processing in *Amexim* was from an "improperly filed one-page letter." Pl. Br. at 4-5 (discussing *Amexim* Scope Ruling at 3). Moreover, Commerce's analytical framework—wherein heat processing triggers the heat processing exclusion only if it is akin to roasting—is without textual basis, illogical, and based on unfounded inferences from *Amexim* and *Trinity*. In that regard, Commerce's "inferences" are without a factual or logical basis and are contradicted by all of the scientific studies and reports provided on the record. To conclude that Export Packers' cooked garlic is "essentially the same product both before and following" heat processing, because Commerce reached that determination in two prior scope rulings involving blanched garlic where there was no evidence of molecular, structural or other changes involved, *see* Gov Br. at 23 (citing *Amexim* and *Trinity* scope rulings), renders Commerce's Final Scope Ruling unsupported by substantial evidence and contrary to law.

**D.  The Government Confirms That Commerce Disregarded Key Evidence and Relied on Other Irrelevant Evidence in Its (k)(2) Analysis**

Commerce should not have conducted a (k)(2) analysis because the plain language of the Fresh Garlic Order and (k)(1) sources clearly demonstrate that cooking garlic cloves triggers the heat process exclusion. However, if the Court reviews Commerce's (k)(2) analysis, it should note the numerous flaws throughout the Government's defense of that analysis.

First, in analyzing the "physical characteristics" factor, the Government starts by discussing the characteristics that the Export Packers' garlic *shares* with in-scope products (a point not at issue), *see* Gov. Br. at 29-30, rather than discussing the significant molecular and structural changes that *differentiate* cooked garlic from fresh garlic, as discussed at length by Export Packers. *See* Pl. Br. at 3-4, 16-19, 22, 24-25 (discussing the Block Report, Zhang Study and Eurofins S-F Report's conclusions, *inter alia*, that boiling garlic reduces its allicin content by

10

approximately 98.5 percent and collapses the cloves' cell walls). Then, the Government asserts that *Amexim* and *Trinity* provided Commerce's benchmark for evaluating the materiality of such changes—despite these rulings containing no such evidence for changes to the garlic that was at issue in these rulings—to summarily dismiss the numerous significant changes to Export Packers' cooked garlic as not "sufficiently material." Gov. Br. at 30. Such a conclusion, supported by mere inference and speculation rather than actual record evidence, cannot possibly meet the "supported by substantial evidence" standard.

As for "expectations of the ultimate user," the Government dismisses evidence explaining that cooking breaks down allicin, garlic's main flavoring ingredient, because it does not discuss "overall consumer perception" regarding different allicin content. Gov. Br. at 32. The Government does not dispute, however, that drastically reducing garlic's primary flavoring ingredient, allicin, significantly changes its flavor, and that customers undoubtedly care about the specific flavor of the food they buy for specific applications. The Government cites no reasonable basis for Commerce discounting all of Export Packers' evidence related to this factor.

Next, the Government criticizes Export Packers for not identifying a "separate end-use" for fresh and cooked garlic. This is blatantly untrue. Export Packers submitted evidence explaining that some recipes require garlic with a lower allicin content than others and showing that supermarkets advertise a number of different types of garlic products based on the product's processing and end use. **PR 25 (**Supp. Questionnaire Responses at 9 and Ex. C.) To the extent that Commerce was seeking evidence of garlic used for something other than *food*, it has stretched the meaning of "end use" to the breaking point.

The Government also contends that the "channels of trade" factor weighs against Export Packers' garlic being "prepared" by "heat processing," even though Export Packers explained

11

that this factor should carry little weight because many food ingredients, not surprisingly, travel through the same channels. Not only does the Government dismiss this argument with a mere conclusory statement about Commerce's findings being "reasonably determined," it actually relies on this factor to try and limit the term "prepared" in the Fresh Garlic Order. Gov. Br. at 34. Specifically, the Government argues that because Export Packers' garlic requires "additional treatment and processing before its final sale and use," the process of boiling garlic cannot constitute a "preparation" that triggers the heat processing exclusion. Gov. Br. at 34-35. This feeble attempt to limit the term "prepared," when in fact many food ingredients require "additional treatment" (and when Commerce refused to look at other, more compelling (k)(1) sources such as dictionary definitions and HTSUS terms) defies logic and should not seriously be considered by this Court.

In discussing the advertising factor, the Government claims that Export Packers failed to distinguish between cooked garlic and in-scope garlic. Gov. Br. at 36-37. However, the Government provides no credible basis for dismissing the evidence of Export Packers' packaging itself, which clearly identifies the product as a separate, "cooked" category of food. Pl. Br. at 28.

Finally, we note that 19 C.F.R. § 351.225(k)(2)(ii) requires that "In the event of a conflict between the factors under paragraph (k)(2)(i) of this section, paragraph (k)(2)(i)(A) will normally be allotted greater weight than the other factors. Paragraph (k)(2)(i)(A) is the part of the (k)(2) analysis focusing on "physical characteristics (including chemical, dimensional, and technical characteristics) of the product." As such, while we believe that a (k)(2) analysis is not required in this instance, in the event that any party conducts a (k)(2) analysis then they must elevate the scientific and technical data submitted – the Eurofins SF Report, the Block Report and the Zhang Study – over any marketing, advertising and sales information. This issue is

important because all of the scientific and technical data submitted establishes unequivocally that Export Packers' garlic cloves are prepared by heating processing (*i.e.,* by being cooked in boiling water) as described and documented in detail herein.

In sum, the Government's selective omission of key evidence throughout its (k)(2) analysis, coupled with its focus on irrelevant evidence—*i.e.*, the fact that both fresh and cooked garlic are used, unsurprisingly, as food—clearly rendered the Final Scope Ruling unsupported by substantial evidence and contrary to law.

## II.  CONCLUSION

For the reasons set forth above, Commerce's Final Scope Ruling was not supported by substantial evidence and not in accordance with law.  As a result, we respectfully request that the Court hold unlawful this determination and remand this case for Commerce to revise the Final Scope Ruling in accordance with the Court's decision.

    Respectfully submitted,

    /s/ Jeffrey S. Neeley
    Jeffrey S. Neeley, Esq.
    Robert Stang, Esq.
    Stephen Brophy, Esq.
    HUSCH BLACKWELL, LLP
    1801 Pennsylvania Avenue NW, Suite 1000
    Washington, DC  20006
    (202) 378-2334
    jeffrey.neeley@huschblackwell.com

    *Counsel for Export Packers Company Limited*

Dated: December 17, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the Court's word limitation requirement. The word count for the foregoing brief, as computed by Husch Blackwell's word processing system (Microsoft Word), is 4,016 words.

Dated: December 17, 2024                                           /s/ Jeffrey S. Neeley
                                                                                    Jeffrey S. Neeley