Case 1:24-cv-00061-JAR   Document 46   Filed 04/18/25   Page 1 of 15

Slip Op. 25-45

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EXPORT PACKERS COMPANY LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>FRESH GARLIC PRODUCERS ASSOCIATION AND ITS INDIVIDUAL MEMBERS, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, AND VALLEY GARLIC<br><br>    Defendant-Intervenors. | Before: Jane A. Restani, Judge<br><br>Court No. 24-00061 |

## OPINION AND ORDER

[Remanding Commerce's Final Scope Ruling regarding whether a product is covered by an antidumping duty order on fresh garlic from the People's Republic of China.]

Dated: April 18, 2025

Stephen William Brophy, Husch Blackwell LLP, of Washington, DC, argued for plaintiff Export Packers Company Limited. With him on the brief were Robert David Stang and Nithya Nagarajan.

Patricia M. McCarthy, Director, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for the defendant. With her on the brief was Isabelle Aubrun, Trial Attorney. Of counsel on the brief was Fee Pauwels, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

John M. Herrmann, II, Kelley Drye & Warren, LLP, of Washington, DC, argued for defendant-intervenor Fresh Garlic Producers Association and its individual members, et al. With him on the brief were Joshua Rubin Morey and Matthew Thomas Martin.

Restani, Judge:  This action is a challenge to the final scope ruling of the United States

Department of Commerce ("Commerce") regarding fresh garlic imported by Export Packers Company Limited ("Export Packers"). The final scope ruling found that Export Packers' imported garlic is included in the antidumping duty ("AD") order on fresh garlic from the People's Republic of China. <u>Final Scope Ruling on Export Packers' Certain Individually Quick Frozen Cooked Garlic Cloves</u>, P.R. 30 (Feb. 21, 2024) ("<u>Scope Ruling</u>"). The garlic in question is certain individually quick frozen ("IQF") cooked garlic cloves that are immersed in boiling or near-boiling water for 90 seconds. <u>Id.</u> at 2, 8. Commerce ruled that Export Packers' cooked garlic cloves have certain physical characteristics that differ from the completely uncooked merchandise but are not considered "prepared" by "heat processing" and are therefore within the scope of the AD order. <u>Id.</u> at 10–11. Export Packers asserts that placing garlic cloves in boiling water for 90 seconds amounts to "heat processing," thereby excluding its garlic from the scope of the order. Defendant the United States ("government") and defendant-intervenor, the Fresh Garlic Producers Association and its Individual Members, et al. (the "Association"), ask that the court sustain Commerce's scope ruling.

For the following reasons, the court remands Commerce's final scope ruling as unsupported by substantial evidence and not in accordance with law.

## BACKGROUND

### I. Antidumping Order

On November 16, 1994, Commerce issued an antidumping order on fresh garlic from the People's Republic of China. <u>Antidumping Duty Order: Fresh Garlic From the People's Republic of China</u>, 59 Fed. Reg. 59209-03 (Dep't Commerce Nov. 16, 1994). Commerce defined the scope of the order, in relevant part, as follows:

> The products subject to this antidumping duty order are all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen,

provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing. The differences between grades are based on color, size, sheathing and level of decay.

The scope of this order does not include: (a) Garlic that has been mechanically harvested and that is primarily, but not exclusively, destined for non-fresh use; or (b) garlic that has been specially prepared and cultivated prior to planting and then harvested and otherwise prepared for use as seed.

The subject merchandise is used principally as a food product and for seasoning. The subject garlic is currently classifiable under subheadings 0703.20.0000, 0710.80.7060, 0710.80.9750, 0711.90.6000, and 2005.90.9500 of the Harmonized Tariff Schedule of the United States (HTSUS). Although the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.

In order to be excluded from the antidumping duties ordered in this notice, garlic entered under the HTSUS subheadings listed above, that is (1) mechanically harvested and primarily, but not exclusively, destined for non-fresh use; or (2) specially prepared and cultivated prior to planting and then harvested and otherwise prepared for use as seed, must be accompanied by declarations to the Customs Service to that effect. We invite interested parties to provide suggested language for the certifications within ten days after publication of this order.

Id. at 59209–10.

## II. Description of Merchandise

Drawing from the scope ruling application submitted by Export Packers, Commerce proceeded with the following description of the merchandise:

The product subject to the Export Packers scope request is certain IQF cooked garlic cloves. The fresh garlic has the roots removed and then peeled and separated into cloves. Thereafter, the fresh garlic is cleaned using flowing water and then spread single-layered on a perforated steel conveyor belt that travels through a continuous boiling machine for 90 seconds wherein the water is kept at a boiling or near-boiling temperature (98°C - 100°C). The cooked garlic cloves are drained and undergo a quick-freezing process to produce the IQF cooked garlic cloves. The IQF cooked garlic cloves were entered under HTS code 0710.80.7060 ("Vegetables (uncooked or cooked by steaming or boiling in water), frozen: Other vegetables: Other: Not reduced in size: Other: Other").

Scope Ruling at 2.

### III. Scope Inquiry Proceedings

Export Packers initially requested a scope ruling on March 31, 2023. <u>Scope Ruling Request</u>, C.R. 3, P.R. 14 (Mar. 13, 2023). Commerce initiated its scope inquiry on May 1, 2023, to determine whether Export Packers' garlic was covered by the scope of the order. <u>Deemed Initiation of Scope Inquiry</u>, P.R. 15 (May 1, 2023).

The Association submitted comments on the scope ruling application on June 7, 2023, and Export Packers submitted rebuttal comments on June 20, 2023. <u>Petitioners' Comments on Export Packers' Request for a Scope Ruling</u>, P.R. 19 (June 7, 2023); <u>Export Packers' Rebuttal Comments</u>, P.R. 20 (June 20, 2023). On August 24, 2023, Commerce issued a Supplemental Questionnaire, to which Export Packers responded on September 12, 2023. <u>Supplemental Questionnaire for Export Packers Company Limited</u>, P.R. 21 (Aug. 24, 2023); <u>Responses to Supplemental Questionnaire</u>, P.R. 25 (Sept. 12, 2023). The Association commented on the questionnaire response on October 3, 2023, and Export Packers submitted a rebuttal on October 10, 2023. <u>Petitioners' Comments on Export Packers' Supplemental Questionnaire Response</u>, P.R. 28 (Oct. 3, 2023); <u>Response to Petitioners' Comments on Export Packers' Supplemental Questionnaire Response</u>, P.R. 29 (Oct. 10, 2023).

On February 21, 2024, Commerce issued a final scope ruling, determining that Export Packers' imported IQF cooked garlic is within the scope of the AD order on fresh garlic. <u>Scope Ruling</u> at 1. This action followed.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19 U.S.C. § 1516a(a)(2)(B)(vi) (2020). Section 1516a(a)(2)(B)(vi) provides for judicial review of a determination of "whether a particular type of merchandise is within the class or kind of

merchandise described in an . . . antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). In conducting its review, the court must set aside any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Ruling is Not Supported by Substantial Evidence

At issue is whether garlic that is immersed in boiling or near-boiling water for 90 seconds should be exempt from an antidumping order that excludes garlic "prepared" by "heat processing." Export Packers argues that it should be. According to Export Packers, Commerce erred in its final scope ruling when it determined that Export Packers' IQF cooked garlic cloves are covered by the scope of the AD order. See Export Packers' Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. at 1–2, ECF No. 20 (July 15, 2024) ("Export Packers Br."). Export Packers contends that (1) the plain language of the order and the (k)(1) sources[1] demonstrate that its imported garlic is excluded from scope because it is "prepared" by "heat processing"; (2) Commerce relied on inapposite prior scope rulings to narrow the "heat processing" exclusion to "roasted" garlic, contrary to the order's plain language; and, (3) Commerce's analysis of the (k)(2) factors[2] disregarded key evidence regarding the effects of cooking Export Packers' garlic, as well as changes to the garlic's physical characteristics, use, expectations of its users, and advertising. See id.

The government responds that because neither the plain language of the order nor the (k)(1) sources were dispositive, Commerce properly considered the (k)(2) factors and correctly

---

[1] 19 C.F.R. § 351.225(k)(1).
[2] 19 C.F.R. § 351.225(k)(2)(i).

determined that Export Packers' garlic is covered by the scope of the order. Def.'s Resp. in Opp. to Pl.'s Mot. for J. upon the Agency R. at 12, ECF No. 26 (Oct. 29, 2024) ("Gov. Br."). The government contends that the order does not explicitly state what "heat processing" means; thus, Commerce was required under 19 C.F.R. § 351.225(k)(1) to analyze applicable (k)(1) sources, which consisted of prior scope rulings.[3] Id. at 16; Scope Ruling at 7. Commerce's prior scope rulings did not explicitly describe garlic being immersed in boiling water such that the garlic was prepared by heat processing.[4] Scope Ruling at 7. The government argues that Commerce was therefore reasonable in conducting an analysis of the (k)(2) factors, where it found Export Packers' garlic to be within scope. See Gov. Br. at 16.

**A. Legal Standard**

When questions arise as to whether a particular product is covered by the scope of an AD order, Commerce will initiate and conduct a scope inquiry and issue a scope ruling to determine whether or not the product is covered. 19 C.F.R. § 351.225(a) (2022).[5] The first step in the inquiry is consideration of the language of the order. See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1356 (Fed. Cir. 2015) ("Scope language is the 'cornerstone' of any scope determination.") (citation omitted). If the scope language is unambiguous, then "the

---

[3] Commerce relied on its prior scope rulings in Trinity and Amexim. See Trinity Scope Ruling, A-570-831 (Dep't Commerce July 21, 2021); Amexim Scope Ruling, A-570-831 (Dep't Commerce June 25, 2004).

[4] As will be discussed further, Commerce's prior scope rulings considered blanched garlic, which it found to be essentially the same product both before and following the blanching process and, as such, is not considered prepared by heat processing. Scope Ruling at 7 (citing Trinity Scope Ruling at 7–8). The issue of whether blanched garlic is within scope is not before the court.

[5] Commerce recently revised its scope regulations, and the changes took effect April 24, 2024. See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 89 Fed. Reg. 20766 (Dep't Commerce Mar. 25, 2024). The court cites to the prior regulations that were in effect when Export Packers submitted its complete scope application.

plain meaning of the language governs." OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020) (citation omitted).

If the scope language is ambiguous, Commerce may utilize the primary interpretive sources listed under paragraph (k)(1) of section 351.225 ("(k)(1) sources") to help it determine the meaning of the language of the scope. 19 C.F.R. § 351.225(k)(1); see Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381–82 (Fed. Cir. 2017). The (k)(1) sources include the descriptions of the merchandise considered by Commerce and the International Trade Commission ("ITC") when crafting the scope, as well as previous determinations made by Commerce and the ITC. See 19 C.F.R. § 351.225(k)(1)(i).[6] If Commerce "determines that the sources under paragraph (k)(1) of this section are not dispositive," Commerce will then consider the factors under paragraph (k)(2) of the section ("(k)(2) factors"). 19 C.F.R. § 351.225(k)(2)(i). The (k)(2) factors include (A) the physical characteristics of the product; (B) the expectations of the ultimate user; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed. Id.

Put simply, the (k)(1) sources assist Commerce in interpreting the scope language, and the (k)(2) factors assist Commerce in determining if the language describes the product at issue. All of Commerce's analysis, however, must be done in such a way that the scope is not changed, and that the order is not interpreted in a manner contrary to its terms. Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001).

---

[6] Although they are not determinative when conflicting with the primary interpretive sources listed by § 351.225(k)(1), Commerce may also look to secondary interpretive sources such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence. 19 C.F.R. § 351.225(k)(1)(ii).

Here, Commerce stated that under the (k)(1) sources its prior scope rulings were not determinative and therefore consideration of the (k)(2) factors was necessary. Scope Ruling at 7. Instead of analyzing additional (k)(1) sources, Commerce stated that it relied upon (k)(2) factors including information about the physical characteristics, expectations of purchasers, ultimate use, channels of trade, and advertising. Id. at 7–10; see, e.g., Saha Thai Steel Pipe Pub. Co. v. United States, 101 F.4th 1310, 1327–31 (Fed. Cir. 2024) (referring to physical characteristics only when necessary for direct comparison to a characteristic described in the (k)(1) source).

### B. Plain Language of the Order and the (k)(1) Sources

Both parties, at least in their briefing, seem to agree that the language of the order is ambiguous in that it does not specify what is meant by "prepared" by "heat processing." See Export Packers Br. at 11; Gov. Br. at 16. Export Packers asserts that "prepared" by "heat processing" should be understood broadly as "subjected to further processing." See Export Packers Br. at 12–16. Export Packers argues that the HTSUS contemplates cooking garlic as a type of processing that prepares a food. Id. at 14–16 ("[T]he ENs to Heading 2106, HTSUS specify that the heading for 'food preparation' covers: Preparations for use, either directly or after processing (such as cooking, dissolving, or boiling in water, milk, etc.), for human consumption.").

The government argues that Export Packers' cited sources fail to clarify what is meant by "prepared" by "heat processing," leaving the term ambiguous. Gov. Br. at 21–22. According to the government, Commerce was reasonable in consulting its prior rulings that indicate that Export Packers' boiling process does not rise to a level of preparation, unlike roasting, that creates a further processed product. Id. at 21–23.

The scope language here does not contain specific exclusionary language such that the phrase "prepared" by "heat processing" should be read to only include processes such as roasting.

Had the scope language been intended to exclude solely roasted garlic as "heat processed," it would have said that. See Saha Thai Steel Pipe, 101 F.4th at 1323 (the scope language is the "cornerstone" of Commerce's analysis) (citation omitted). In the absence of such language, the court sees no reason why "boiled" or "cooked" garlic would not be considered "heat processed" per the plain language of the scope. "Prepared" by "heat processing" is not ambiguous just because there can be many kinds of heat processing. It is unclear to the court why Commerce concluded that Export Packers' garlic that is cooked in boiling water for 90 seconds to the degree that its internal chemical structure is altered is not heat processed. Thus, the court disagrees with the parties to the extent they assert that these words are ambiguous when viewed in the context of the process at issue.

### C. Commerce's Focus on Prior Scope Rulings is Misplaced

After examining the language of the scope, Commerce turned to some (k)(1) sources for guidance. See Meridian, 851 F.3d at 1381–82. As mentioned, Commerce chose to consider only its prior scope rulings in Trinity and Amexim under (k)(1).[7] Scope Ruling at 7. Commerce found these prior rulings non-dispositive because neither explicitly describe garlic being immersed in boiling water as heat processed. Id. Commerce, however, did rely on the Trinity and Amexim rulings in its analysis of the garlic's physical characteristics under (k)(2), to conclude that "[t]he purpose of the 'heat processing' exclusion language is to 'exclude further processed products,' like roasted garlic." Scope Ruling at 8. Commerce found that because Export Packers' garlic does not

---

[7] Commerce did not consider any secondary interpretative sources under (k)(1), including "any other determinations of the Secretary or the Commission . . . , Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." See 19 C.F.R. § 351.225(k)(1)(ii).

amount to the same level of preparation as roasted garlic, it is not "heat processed" per the scope's exclusion. Id.

Beginning with the Trinity scope ruling, Commerce noted that Trinity's IQF garlic cloves were blanched, not boiled. Scope Ruling at 7. Trinity described "blanching" as the process of scalding vegetables in boiling water or steam, which cleanses the surface of dirt, stops enzyme action that causes loss of flavor, color, and texture, and reduces the number of microorganisms. Trinity Scope Ruling at 3 n.17. The garlic cloves in Trinity were blanched by being hot steamed for 20–30 seconds at a temperature of over 95 degree Celsius. Id. Trinity argued that its blanching process constitutes "heat processing" per the scope's exclusion. Id. at 3. Commerce disagreed. Although Commerce did not contest that "the blanching process has a heating element to it," Commerce determined that the heat processing exception was intended to "exclude further processed merchandise," and Trinity's garlic is "essentially the same product both before and following the blanching process." Id. at 7–8 (citing Amexim Scope Ruling at 6–7). Thus, Commerce concluded that Trinity's garlic did not fall within the "heat processing" exception. Id. at 8.

Commerce also relied on its prior ruling in Amexim. Amexim filed a scope ruling application pertaining to its "garlic cloves in brine." Amexim Scope Ruling at 1. Similar to Trinity's request, Amexim claimed its garlic is heat processed "by being blanched in boiling water for five minutes."[8] Id. at 2. In response to Amexim's application, Commerce requested more

---

[8] Amexim's garlic is also pickled in 22-degree salinity brine for two months, which it claimed thereby changes the garlic's characteristics from fresh to pickled. Amexim Scope Ruling at 2. The language "blanched in boiling water for five minutes" is likely an error. Blanching involves steaming or boiling for a brief time. "Blanching is also a cooking term that describes a preparatory process wherein the food, usually a vegetable or fruit, is heated in steam or hot water for a short time, and cooled by plunging into iced water or water spray to stop the cooking process." Blanching, Science Direct, https://www.sciencedirect.com/topics/agricultural-and-biological-

information regarding the blanching process. Id. ("We asked Amexim to explain the blanching process in detail, what happens to the garlic during the blanching process, the purpose of the blanching process, and why it believes that the blanching process classifies as heat processing."). Amexim failed to explain its blanching process in detail, what happens to the garlic during the blanching process, or why the blanching process qualifies as "heat processed." Id. at 3. Amexim only explained that the purpose of the blanching process is to rid the garlic clove's surface of peroxidase and to stop the garlic from sprouting. Id. As a result of Amexim's deficient response, Commerce found there was insufficient information to conclude Amexim's garlic was heat processed. Id. at 7.

From these prior rulings, Commerce concluded that even though Export Packers' garlic has certain different physical characteristics from fresh garlic due to a heating element, it is not considered "prepared" by "heat processing." Scope Ruling at 8. According to Commerce, the "purpose of the 'heat processing' exclusion language is to 'exclude further processed products,' like roasted garlic. In other words, 'heat processing' increasing to the level of 'roasting' might be considered a 'further processed product,' but Export Packers' boiling of the garlic does not amount to the same level of preparation." Id. (citing Trinity and Amexim Scope Rulings). Commerce's reliance on its prior rulings here is misplaced.

As an initial matter, the blanching processes involved in Trinity and Amexim are different from Export Packers' cooking process. As Commerce itself stated, "Trinity's IQF garlic cloves were blanched, not boiled," and Amexim's garlic was processed in a manner that "Amexim

---

sciences/blanching (last visited Apr. 14, 2025). This definition is consistent with Export Packers' statement defining blanching as "scalding vegetables in boiling water or steam for a short time, which cleans the surface of dirt and organisms and is typically followed by quick, thorough cooling in ice water." Export Packers' Rebuttal Comments at Ex. C ("Block Report"). Boiling for five minutes would create a completely cooked (or perhaps unusable) product.

considered . . . as blanching." Scope Ruling at 7. It does not follow that because Commerce previously determined blanched garlic is not heat processed, that therefore Export Packers' cooked garlic is also not heat processed. Nonetheless, using either the limited process at issue in Trinity or the unexplained process at issue in Amexim as the new touchstone is improper. The touchstone remains the words of the order.

Export Packers submitted evidence in the form of three expert reports to support its view that the process of cooking garlic changes the physical characteristics of garlic far more than blanching does.[9] See Export Packers' Rebuttal Comments at Ex. C ("Block Report") ("Cooking garlic in boiling water for 90 seconds reduces its allicin content, the active flavoring ingredient that provides fresh garlic its distinctive pungent taste and aroma, by approximately 98.5 percent of the original level. Blanching garlic, however, reduces garlic's allicin content by only approximately 10 percent."). Each report is consistent in concluding that cooking garlic irreversibly alters its molecular structure, chemical content, and texture.[10] See id.; see also Scope Ruling Request at Ex. E ("Eurofins Report"); Export Packers' Rebuttal Comments at Ex. C ("Zhang Study"). Commerce chose to disregard this evidence and instead dogmatically relied upon its prior scope rulings involving inapposite processes to conclude that Export Packers' garlic is not heat processed. The court struggles to follow Commerce's reasoning that although Export Packers' cooked garlic has certain different characteristics due to a heating element, it is

---

[9] For example, the Eurofins Report conducted a Scanning Electron Microscopy Analysis that "showed differences in microstructure supporting evidence of heat treatment. The raw sample cells appeared the most rigid and intact, the blanched sample cells generally showed less rigid cell structure, and the cells in the cooked sample had a collapsed appearance." Eurofins Report at 2.

[10] At oral argument, the court made clear that it would not affirm Commerce's ruling. No party suggested that the record was insufficient or asked that the record be reopened. Nothing in the record rebuts the experts' findings that cooked garlic is substantially different in flavor, aroma, and texture from raw garlic. See Block Report at 1.

nevertheless not "heat processed." Export Packers' garlic is cooked, and it is labeled as such. See Responses to Supplemental Questionnaire at 4–6. The government fails to establish cooking is not heat processing.

Further, Commerce's prior scope rulings in Trinity and Amexim, at most, support the conclusion that roasting garlic could be one example of heat processing—importantly, it need not be the only example. The government cites to no record evidence that restricts the "heat processing" language to just roasting other than these prior rulings, which cite roasted garlic as a mere example of a product that "might be considered excluded from the Order." Amexim Scope Ruling at 6. Commerce's extrapolation from these prior scope rulings on blanched garlic to the facts of this case, which involves an entirely different process, was plainly unreasonable.

### D. The Remainder of Commerce's (k)(2) Analysis Was Similarly Flawed

Commerce continued to unreasonably rely on its prior scope rulings throughout the remainder of its analysis under the (k)(2) factors. First, Commerce considered the physical characteristics of Export Packers' garlic. Commerce noted record evidence that immersing garlic in boiling water for 90 seconds results in a different molecular structure, chemical content, and texture than fresh garlic, which results in a change in taste, aroma, and mouthfeel. Scope Ruling at 8. Commerce determined that Export Packers' cooked garlic is still garlic that is used as food or seasonings, and is still frozen, which is covered by the plain language of the scope. Id. This determination, however, ignores the "heat processing" exclusion language which explicitly renders garlic "prepared or preserved" by "heat processing" out of scope. Commerce then went on to reiterate its claim that, citing to Trinity and Amexim, Export Packers' garlic is not heat processed because it does not amount to the same level of preparation as roasted garlic. Id. Again, as stated supra pages 9–10, if the scope language was intended to exclude roasted garlic only, it would have

said so. Export Packers' garlic is cooked in boiling water for 90 seconds so that its chemical makeup and texture is changed. Rather than dealing with this fact, Commerce again relied on its prior rulings in Trinity and Amexim, which involved blanched, not cooked garlic, to conclude Export Packers' cooked garlic is not heat processed. As stated supra pages 10–13, this conclusion is not supported by substantial evidence.

Next, Commerce considered the remaining (k)(2) factors, including expectations of the ultimate users of Export Packers' garlic as compared to those of the subject merchandise. Commerce found that users of Export Packers' garlic do not have a unique expectation compared to the subject merchandise, but the information focused on retailers, not further processors, the market for Export Packers' product. See Scope Ruling at 9–10; Responses to Supplemental Questionnaire at 8. Similarly, Commerce found the ultimate use of Export Packers' garlic and the subject merchandise to be the same, as they are both used as an ingredient or seasoning in a variety of fresh and frozen foods. Id. These are such broad concepts, however, that they are not useful in this scope analysis. Any garlic, processed or not, is a food ingredient or seasoning. The scope language did exclude some garlic so evidence that relates to all garlic is not helpful.

If there is any merit in Commerce's analysis of the (k)(2) factors, apart from the paramount physical characteristics factor, it would not change the result. Commerce had no need to resort to the panoply of (k)(2) factors. Nor should it, in embarking on a (k)(1) analysis, have substituted its prior rulings regarding blanched garlic for the words of the order. The garlic at issue is clearly prepared by heat processing and physically transformed by that process.

## CONCLUSION

Commerce's ruling is not supported by substantial evidence. In fact, it is clearly in conflict with the applicable scope language. No further analysis under the applicable regulation is required.

For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion. The remand determination shall be issued within 30 days hereof. Comments may be filed 15 days thereafter and any response 10 days thereafter.

      /s/ Jane A. Restani   
Jane A. Restani, Judge

Dated: April 18, 2025
New York, New York